**Jason L. HONIGMAN and Edith Honigman et al., Petitioners-Appellants, Petitioners-Cross-Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee, Respondent-Cross-Appellant.**

**Nos. 71-1927, 71-1928.**

United States Court of Appeals,
Sixth Circuit.

Aug. 3, 1972.

Miles Jaffe, Honigman, Miller, Schwartz & Cohn, Detroit, Mich. (Michael Z. Shubow, Detroit, Mich., on the brief) for Honigman and another.

Mrs. Issie Jenkins, Atty. for Tax Division, Dept. of Justice, Washington, D. C., (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Paul M. Ginsburg, Dept. of Justice, Tax Division, K. Martin Worthy, Chief Counsel Internal Revenue Service, Washington, D. C., on the brief) for Commissioner of Internal Revenue.

Before PHILLIPS, Chief Judge, and EDWARDS and CELEBREZZE, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal and cross-appeal from a decision of the United States Tax Court reported at 55 T.C. 1067 (1971). We affirm as to the issues on

appeal and reverse as to the issue on cross-appeal.

The principal controversy involves the tax consequences of the sale of corporate property below market value to a minority shareholder. A secondary unrelated question will be treated in Part III of this opinion, *infra*.

### I.

Reference is made to the reported Tax Court decision for a detailed statement of the facts. The National Building Corporation was incorporated under the laws of Michigan in 1946 to engage in the ownership and operation of commercial real estate. Its principal stockholders were the Honigman family (35%), the Silberstein family (35%) and the Galperin family (20%). A member of each family held a position as a director and officer of National.

In early 1963 steps were undertaken to effect a complete liquidation of National. A preliminary agreement to sell its principal asset, the First National Building in Detroit, was entered into in February 1963. At that time, National's only unsuccessful investment was the Pantlind Hotel in downtown Grand Rapids, Michigan, which it had acquired in 1951. Taxpayers were aware that the Pantlind should be sold prior to adoption of the liquidation plan in order to permit the corporation to recognize the loss on this sale while shielding it from recognition of the substantial gains to be realized from the sale of the remaining assets. During this time, unsuccessful efforts were made to sell the hotel at offering prices ranging from $200,000 to $250,000 over its $590,000 mortgage. At an informal meeting of the directors in April, Jason Honigman proposed that the property be sold for a "nominal" price of $50,000 over mortgage. The hotel had not been offered previously at this price, nor was such an offer ever made to outsiders. Ben Silberstein initially indicated an interest in the transaction, but subsequently declined the purchase. Honigman later decided to buy the property at the "nominal" price.

The Pantlind Hotel Corporation was organized under Michigan law to purchase the hotel for some $661,000, representing assumption of the mortgage and a $21,000 tax liability, and $50,000 cash. Mrs. Edith Honigman, wife of Jason Honigman, was the sole stockholder. Title was transferred on May 27, 1963. Two days later a further adjustment of about $38,000 was paid to National. At the time of the sale, National's adjusted basis in the Pantlind was approximately $1,486,000.

In August 1963 National adopted a qualified liquidation plan. All assets were sold within one year and the proceeds distributed pro rata to the shareholders.

The Honigmans reported no income from the May transaction on their 1963 joint income tax return. National deducted the difference between the sale price and the basis of the Pantlind as a business loss on its corporate tax return. The Commissioner determined a deficiency against the Honigmans individually, asserting that they had received a taxable dividend from the Pantlind sale equal to the excess of the fair market value over the purchase price. The fair market value was asserted by the Commissioner to have been $1,300,000. A further deficiency was asserted against the Honigmans as transferees of National, the Commissioner disallowing National's claimed loss deduction on the ground that the constructive dividend to the Honigmans was not recognizable as a loss by the corporation. Similar transferee liability was asserted against the Silbersteins and Galperins.

These deficiencies were contested in a consolidated Tax Court proceeding. The Tax Court found that the fair market value of the Pantlind at the time of sale was $830,000. The court held the transaction to have been a dividend to the Honigmans to the extent of the difference between the market value and sale price and a sale to the extent of the difference between adjusted basis and market value. The former was held to be includible as income to the Honigmans

and not deductible by National. The latter was held to be deductible by National.

A threshold question is whether the Tax Court's finding as to the fair market value was clearly erroneous. At trial taxpayers and the Commissioner introduced appraisal evidence as to the fair market value of the Pantlind at the time of the sale. Taxpayers' proofs showed values of $625,000 (Berry appraisal), $660,000 (Horwath appraisal), and $700,000 (Harris appraisal). The Commissioner's evidence indicated values of $1,300,000 (Humphrey appraisal) and $967,000 (Broersma appraisal). Taxpayers further showed that the local managers of the Pantlind had purchased stock in the Pantlind Corporation for the same price per share as Mrs. Edith Honigman has paid and that the lessor of about 20 per cent of the hotel and underlying land had sold it to the Pantlind Corporation for $137,000 in December 1964.

All appraisals were based on the capitalization of earnings method of valuation which is conceded by all parties to have been the appropriate method. This technique projects future earnings and applies a multiple based upon the accepted rate of return for such investments. The Tax Court employed an average of the income during the five years prior to the sale to project future annual earnings of $135,000. This figure, coupled with a 15 year useful life, a five per cent interest rate, and a nine per cent capitalization rate yielded the $830,000 figure. There is no controversy as to the appropriateness of the useful life, interest rate and capitalization rate values used by the Tax Court.

■ Taxpayers' principal attack on the valuation involves the projected earning. They urge that only fiscal years 1961–62 should be averaged to project earnings, these being the most recent figures reflecting the downward earnings trend which then was expected to continue. Projected earnings based upon an average of these two years would be $115,000 annually, yielding a

market value below the sale price. The Commissioner urges that the decline in earnings reflected in the two years immediately prior to the sale was unrepresentative and contends that the five year average was appropriate. In light of the conflicting evidence as to the proper earnings figures to be used in projection, we are unable to say that the use of a five year average was clearly erroneous.

Taxpayers further urge that even if a five year average is used, the Tax Court projection is overstated, contending that "[i]n using projected earnings of $135,000, the trial judge apparently adopted the earnings projection in the Broersma Appraisal." It is then contended that Broersma's figures are incorrect in that they are based on material factual errors. We do not agree with this contention. There is no support in the record for taxpayers' assumption as to the source of the Tax Court's figures. Taxpayers' principal expert witness's report shows five year average annual earnings of just under $138,000.

■ The Tax Court rejected as unrepresentative the sale of Pantlind stock to the local managers and of the part of the hotel to Pantlind Corporation by the lessor, relying on the opinions of all expert witnesses that there were no comparable sales. On this record we cannot say that this rejection was unwarranted. The managers were key personnel and the lessor had some 50 years remaining on a long term lease of one-fifth of the property to the hotel. The expert opinion was unanimous to the effect that there were no comparable sales. This evidence is entitled to substantial weight.

■ The finding of the Tax Court as to fair market value is further supported by an alternative rough valuation approach. Taxpayers' expert witness testified that hotels were selling at between six and eight times annual earnings at the time of the sale. This expert's own projected earnings of $116,500 yields a value between $699,000 and $932,000.

The Tax Court figure of $135,000 yields a value between $810,000 and $1,080,000. On the record before us, we decline to set aside the Tax Court's finding of fair market value in the amount of $830,000.

The principal legal argument on behalf of the taxpayers is that the excess of fair market value over purchase price of an asset purchased from a corporation by a stockholder is a necessary but not sufficient condition for the declaration of a constructive dividend to the extent of the excess. It is urged that there also must be an intent to distribute a dividend and that such intent is negated by a showing that the sale was made in good faith for a valid business purpose to a noncontrolling stockholder.

We do not accept this argument. A dividend, includible in the recipient's gross income under § 301(c) [1] and not recognizable as a loss by the corporation under § 311(a), is defined in § 316 as follows:

"§ 316. Dividend defined

"(a) General rule.—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders—

"(1) out of its earnings and profits accumulated after February 28, 1913, or

"(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection."

As stated by the Supreme Court:

"[I]t is clear that when a corporation sells corporate property to stockholders or their assignees at less than its fair market value, thus diminishing the net worth of the corporation, it is engaging in a 'distribution of property' as that term is used in § 316. Such a sale thus results in a dividend to shareholders unless some specific exception or qualification applies." Commissioner of Internal Revenue v. Gordon, 391 U.S. 83, 89–90, 88 S.Ct. 1517, 1521, 20 L.Ed.2d 448 (1968) (Footnote omitted.)

"If a distribution meets the requirements of the statutory definition of a dividend, then it is regarded as such notwithstanding the fact that it was intended to be a payment of some other kind. Christopher v. Burnet, 60 App.D.C. 365, 55 F.2d 527, 528 (1931); Hadley v. Commissioner of Internal Revenue, 59 App.D.C. 139, 36 F.2d 543, 544 (1929). It is not necessary that the dividend be formally declared, or that the payment be termed a dividend, or that the payment be made to all the shareholders. Lengsfield v. Commissioner of Internal Revenue, 241 F.2d 508, 511 (5th Cir. 1957); Regensburg v. Commissioner of Internal Revenue, 144 F.2d 41, 44 (2d Cir.), cert. denied, 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625 (1944). For example, distributions have been regarded as dividends where a corporation makes a loan to a shareholder and later cancels the indebtedness, or sells property to a shareholder for a purchase price far below its fair market value, or pays compensation to an office-shareholder in an amount in excess of the value of his services. In cases such as these and others involving the same problem, courts have had little difficulty in holding the distri-

1. All statutory references are to the Internal Revenue Code of 1954, as amended.

bution, or that part of it in excess of the *quid pro quo*, to be a dividend, notwithstanding the fact that neither the shareholder not the corporation 'intended' that a dividend be paid. It is not the intent of the parties that governs the characterization of the distribution, but rather the economic and consequent legal effect of their actions." Dynamics Corporation of America v. United States, 392 F.2d 241, 246–247, 183 Ct.Cl. 101 (1968). Accord United States v. Smith, 418 F.2d 589, 593–594 (5th Cir. 1969).

Taxpayers' reliance on Palmer v. Commissioner of Internal Revenue, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937), is misplaced. As noted in *Palmer,* a constructive dividend results where a "transaction is in purpose *or effect* used as an implement for the distribution of corporate earnings to the stockholders." *Id.* at 70, 58 S.Ct. at 70 (emphasis supplied).

The Tax Court found that the sale of the Pantlind below market diminished the net worth of National. There was no question that National had sufficient earnings and profits to support a dividend in the amount stated in the deficiency notice. Essentially the taxpayers urge this court to draw inferences from the evidence different from those drawn by the Tax Court. This we decline to do under the record in this case. Since we hold that there is no clear error in the findings of the Tax Court, we affirm. See Palmer v. Commissioner of Internal Revenue, supra, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50; Edmister v. Commissioner of Internal Revenue, 391 F.2d 584, 585 (6th Cir. 1968).

■ Taxpayers further assert that the decision of the Tax Court was erroneous on the ground that the Pantlind was sold to a corporation not a shareholder of National. As noted by the Tax Court:

"Although in form, the sale was to Michigan Pantlind, a corporation, the parties both at trial and on brief have treated Edith Honigman, who owned 100 percent of Michigan Pantlind's stock at all times material to this case, as the purchaser of the hotel. In his notice of deficiency to the Honigmans, respondent explained his determination that a portion of the deficiency was 'the result of your *indirect purchase* of this property [the hotel] for less than its fair market value.' [Emphasis added.]" 55 T.C. at 1077, n. 2.

Our examination of the record confirms that this was the posture of the case before the Tax Court. Further, the evidence shows to our satisfaction that, looking through form to substance, the sale was made to the Honigmans. *See* Helvering v. Horst, 311 U.S. 112, 61 S. Ct. 144, 85 L.Ed. 75 (1940); Sammons v. United States, 433 F.2d 728, 730 (5th Cir. 1970), cert. denied, 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971).

■ The Honigmans further assert that the sale was a distribution in partial liquidation of National pursuant to § 346, thus affording capital gains treatment to the asserted deficiency under §§ 331(a) (2), 1221. The Tax Court rejected this contention on the ground that no partial liquidation had been proved. The court noted that there was no formal or informal plan of partial liquidation and no redemption of stock. As with those issues previously dealt with, the finding of the Tax Court has not been shown to have been clearly erroneous and will not be set aside. See Earle v. Woodlaw, 245 F.2d 119, 122 (9th Cir), cert. denied, 354 U.S. 942, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957). Accordingly, the decision of the Tax Court with respect to the individual liability of the Honigmans is affirmed.

## II.

■■ We turn next to the cross appeal of the Commissioner. The Tax Court held that the sale of the Pantlind Hotel by National to the Honigmans was partly a constructive dividend and partly a sale. To reiterate the details of this transaction, the hotel had an adjusted basis to National of $1,468,168.51. The

Honigmans purchased the hotel for $661,280.21. The Tax Court found that its fair market value was $830,000. It held that the transfer of the hotel to the Honigmans was to be treated for tax purposes as in part a dividend to the Honigmans in an amount equal to the difference between the purchase price and the hotel's fair market value (i. e., a constructive dividend of $168,719.79); and in part a sale to the extent of the excess of basis over fair market value. The Tax Court thus fragmented the transaction into part dividend, part sale. It further held that only the sale portion constituted a taxable event with respect to National. National was allowed a recognizable loss on this transaction to the extent of the difference between the fair market value of the hotel and its adjusted basis. Under the holding, National was allowed to allocate 100 per cent of the hotel's basis to the sale portion of the transaction.

The Commissioner asserts that this part of the decision of the Tax Court is in direct contravention of the Congressional purpose and nonrecognition mandate contained in § 311(a), which provides that no gain or loss shall be recognized to a corporation on distributions to a shareholder with respect to its stock. The Commissioner contends that the purpose of § 311 is to segregate and remove from gain or loss recognition those distributions which are made to shareholders on account of their status as shareholders. We agree with the Commissioner.

The portion of the hotel transaction which the Tax Court held to be a constructive dividend distribution to the Honigmans represented a distribution to shareholders with respect to National's stock under § 301. The non-recognition of loss provision contained in § 311 would prohibit any recognition of loss on this part of the transaction. Yet, by allowing National a loss on the transaction measured by the difference between the hotel's adjusted basis and its fair market value, the Tax Court has permit-

ted National to receive the benefit of a loss on that portion of the transaction held to be a distribution with respect to National's stock. We agree with the Commissioner that in order to give effect to the requirement of § 311, the basis of the hotel must be fragmented proportionately between the sales aspect and the distribution aspect of the transaction. The sale portion should be given recognition only to the extent that the basis allowable to the sale exceeds the consideration paid. Since the Honigmans paid $661,280 for the hotel property which had a fair market value of $830,000, they have purchased in their capacity as buyers a fractional interest represented by $661,280/$830,000. The loss resulting to National from the sale portion of the transaction thus should be computed by allocating a like per cent of the adjusted basis ($1,174,534) to the sale portion, which would result in a recognized loss to National of the difference between the consideration paid and the proportionate share of the basis allocated to the consideration paid.

In the present case, using approximate figures for the the the purchase price ($660,000), market value ($830,000) and adjusted basis ($1,470,000), approximately 66/83 of the property was sold and 17/83 was distributed as a dividend.

Therefore, we reverse as to that part of the decision of the Tax Court covered by the cross-appeal of the Commissioner. We remand for recomputation of the loss properly recognizable by National and the resulting amount of transferee liability for each of the taxpayers.

### III.

In fiscal 1961 National expended $87,000 for repairs of the parking garage floor in the First National Building. Some $11,000 was spent in the following fiscal year for an engineering survey of the floor to evaluate its condition and recommend corrective measures. National deducted these expenses as current business expenditures. The Commissioner disallowed these expenses,

asserting them to have been for capital improvements.

The evidence showed that salt carried into the garage from the street by automobiles during the winter had caused deterioration of the concrete floor and steel reinforcing and supporting structures. The repairs made were of two types: replacement of complete 16 foot square parking bays and minor patching of smaller floor areas. There was no proof as to allocation of costs between these types of repairs. The Tax Court held that the bay replacements and engineering survey expenses were capitalizable and the patching expenses currently deductible. Under the rule of Cohan v. Commissioner of Internal Revenue, 39 F.2d 540 (2d Cir. 1930), $2,500 was allocated to the deductible repairs.

There is no question that the applicable law is summarized in Treas.Reg. § 1.162–4, which provides:

"§ *1.162–4 Repairs*

"The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinary efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept."

Applying this legal test, the Tax Court held that the bay replacement and engineering survey costs were capital in nature. We hold that this finding is not clearly erroneous and therefore decline to set it aside.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.