HERBERT CARVER AND DOROTHY CARVER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; C. GERARD AND MARJORIE DRUCKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carver v. Commissioner
Docket Nos. 15106-90, 15107-90
United States Tax Court
T.C. Memo 1992-94; 1992 Tax Ct. Memo LEXIS 105; 63 T.C.M. (CCH) 2092; T.C.M. (RIA) 92094; February 18, 1992, Filed *105 Decisions will be entered for petitioners. David R. Andelman and Edward F. Fay, for petitioners. Barry Laterman, for respondent. TANNENWALD
TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes for 1983 as follows: Additions to tax Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6661(a)
Herbert Carver and Dorothy Carver (Docket No. 15106-90)
$ 1,008,386
$ 50,419
[2]
$ 252,097
C. Gerard Drucker and Marjorie Drucker (Docket No. 15107-90)
$ 1,008,386
$ 50,419
[2]
$ 252,097
The principal issue for decision is the fair market value of land purchased by petitioners in 1983. Resolution of this issue will determine whether petitioners omitted from their 1983 Federal income *106 tax returns an amount which exceeded 25 percent of the amount of gross income stated in their returns. If this issue is resolved in favor of respondent, then the issues involving the applicability of sections 6653(a) and 6661 will have to be decided. In order to avoid unnecessary repetition, we have combined our findings of fact and opinion. Some of the facts have been stipulated and are so found; the stipulation and the accompanying exhibits are incorporated herein by reference. Petitioners, Herbert Carver and Dorothy Carver, husband and wife, and Gerard Drucker and Marjorie Drucker, husband and wife, resided in Newton Centre, Massachusetts, at the time they filed their petitions in this case. They timely filed joint Federal income tax returns for 1983 with the Internal Revenue Service Center, Andover, Massachusetts. Herbert Carver and Gerard Drucker (petitioners) [3] were officers and employees of Atlantic Corporation (Atlantic), a Massachusetts corporation, at all times during 1983. Petitioners' wives, children, and mothers-in-law, directly or indirectly, owned all the issued and outstanding stock of Atlantic. Carver served as president and Drucker as vice-president and *107 treasurer of Atlantic throughout 1983. Atlantic was liquidated pursuant to a plan of liquidation adopted by the shareholders and directors on December 14, 1984. Atlantic owned lots 1, 2, 3, and 4, otherwise referred to as the Teaticket property, consisting of 9.57 acres and located in the Town of Falmouth, Massachusetts (Falmouth). Falmouth is located along the southerly boundary of Cape Code, approximately 75 miles southeast of Boston. It is bordered on the north by the Towns of Bourne and Sandwich, on the east by the Town of Mashpee, on the west by Buzzards Bay, and on the south by the Vineyard and Nantucket Sounds. Atlantic purchased the Teaticket property in 1964. The property is located on the northwest corner of the intersection of Jones Road and Route 28 *108 in Falmouth. Route 28 is the major thoroughfare through the Town of Falmouth and is the major south coastal route of Cape Code, running in an easterly direction from downtown Falmouth into the adjacent Town of Mashpee. Jones Road extends in a westerly direction from Teaticket Plaza and serves as an alternate downtown route allowing traffic to bypass the more congested sections of Route 28. That portion of Route 28 on which lot 4 is located, and continuing in a southerly direction, is referred to as Davis Straits. A short distance north of the subject property, Davis Straits becomes the Teaticket Highway. Teaticket Plaza, situated on lots 1, 2, and 3, was developed in the 1960s as a neighborhood shopping center and, in 1983, comprised a Bradlees Department Store (Bradlees), a Rix Drugstore (Rix), and a Sherwin Williams Paint Store. Lot 4 was utilized as a paved parking area for the three stores until it was improved by a Stop & Shop supermarket. It contains 188,615 square feet and has frontage of 214.11 feet on Route 28 and 249.81 feet on Jones Road. Lot 4 is encumbered by a public use district restriction which prohibits any construction on the front 200 feet of property located *109 along Route 28. The paved parking lot encroached upon the public use district but was permitted due to the fact that its placement thereon preceded the enactment of the public use district, i.e., grandfathered. Retail space occupied by Bradlees and Rix was leased from Atlantic in 1965 and 1972, respectively. Under the terms of each lease, Atlantic was restricted in respect of the type of stores and improvements that could be placed on the remaining Teaticket property. The terms of the Bradlees lease provided that Atlantic would not "use, or lease, or permit to be used all or any part of the Shopping Center, or any building structure therein (except the demised premises)" for any of the purposes specifically prohibited in the lease, i.e., for businesses that would compete with Bradlees. Certain uses were permitted, but they were extremely limited and provided little potential for development. These restrictions were imposed upon "(a) any person or legal entity named as Landlord in this lease, whether such person or legal entity is so named in his, her or its capacity as a partner, co-tenant, or otherwise, or (b) any successor in interest to any such person or legal entity". *110 Similar provisions were contained in the Rix lease. The greater part of recent commercial growth in Falmouth has taken place along Route 28 between East Main Street and downtown Falmouth (west of the property) and the Teaticket Highway area (east of the property), making the subject property an especially suitable location for commercial development. Sometime in late 1982, Drucker was contacted by John McWeeney, a representative of Stop & Shop, the owner of Bradlees Department Store, who expressed an interest in locating a Stop & Shop supermarket on lot 4 of the Teaticket property. Believing that individual ownership of lot 4 would provide them with certain tax benefits, petitioners decided to purchase lot 4 of the Teaticket property from Atlantic before entering into the lease with Stop & Shop. They were advised by their certified public accountant that an independent appraisal of lot 4, to ensure a fair purchase price, would be prudent on account of their relationship with Atlantic. Accordingly, Atlantic retained Alan Dana (Dana) to appraise the property as of January 1, 1983. The results of Dana's appraisal indicated that lot 4 had a fair market value of $ 190,000. On May *111 2, 1983, Atlantic entered into an agreement to sell lot 4 to petitioners for $ 200,000. Following their purchase, petitioners continued negotiations with Stop & Shop concerning the proposed lease of lot 4 for a supermarket. A tentative agreement, providing that Stop & Shop pay petitioners $ 50,000 a year plus an amount equal to the yearly debt service on the building petitioners were to construct, was reached in late spring of 1983. The term of the lease was to be for 25 years from the date of completion of the building. The lease, which embodied the exact terms of the tentative agreement, was executed on December 2, 1983. Because of provisions contained in the Atlantic-Rix lease prohibiting any retail store, such as a Stop & Shop, on the property which would engage in the sale of products currently sold by Rix, Stop & Shop entered into a settlement agreement with Rix whereby Stop & Shop paid Rix $ 150,000 for its consent to locating a supermarket on lot 4. Notices of deficiency were mailed to petitioners on April 13, 1990, in respect of their 1983 Federal income tax returns. Petitioners have not consented to any extension of the time to assess income taxes with respect to *112 the 1983 taxable year. The 3-year statute of limitations provided in section 6501(a), applicable to petitioners' taxable year ended December 31, 1983, expired no later than April 17, 1987. Under section 301, if property is transferred by a corporation to a shareholder for less than its fair market value, the shareholder is generally deemed to receive a dividend to the extent the fair market value exceeds the purchase price. See Honigman v. Commissioner, 55 T.C. 1067, 1077 (1971), affd. on this issue 466 F.2d 69, 73 (6th Cir. 1972); sec. 1.301-1(j), Income Tax Regs. Although petitioners were not shareholders of Atlantic, they were, under the constructive ownership rules of section 318(a), considered as owning the stock in Atlantic owned by their spouses and children for purposes of section 301. See sec. 318(a)(1); sec. 1.318-1(a), Income Tax Regs. Thus, if petitioners purchased lot 4 from Atlantic for less than its fair market value on the date of transfer, they realized income in the form of a dividend. Petitioners do not dispute the applicability of the foregoing principles to them. Since the deficiency notices herein were not issued within *113 the normal 3-year period of limitations, section 6501(a), the controlling issue is whether the amount of the income omitted from petitioners' 1983 Federal income tax returns exceeded 25 percent of the amount of gross income stated in those returns so as to bring the 6-year statute of limitations set forth in section 6501(e) into play. [4] Resolution of this issue turns on a determination of lot 4's fair market value at the time petitioners purchased the property from Atlantic. Only if that value equaled or exceeded $ 944,669 can respondent possibly prevail.[5]Respondent has the burden of proof. Peters v. Commissioner, 51 T.C. 226, 230 (1968). See Dillingham v. Commissioner, 903 F.2d 760, 762 (10th Cir. 1990), affg. 88 T.C. 1569 (1987). *114 Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value of property as of a given date is a question of fact. Symington v. Commissioner, 87 T.C. 892, 896 (1986). That value reflects the highest and best use of the property on the date of valuation. Stanley v. Commissioner, 87 T.C. 389, 400 (1986). Determination of the fair market value is not dependent on whether the property is actually being put to its highest and best use. Rather, it is the realistic, objective potential uses to which the property can be put. Id.
Both parties, presumably for their own purposes, initially took extreme positions, which they modified substantially at trial. Thus, petitioners, who, in 1983, relied on Dana's $ 190,000 appraisal in determining the fair market value of lot 4, now rely principally on appraisal of $ 660,000 by John Kline (Kline). Respondent based his notices of deficiency on a figure of $ 4,233,544 [6] but now *115 abandons that figure and contends that the fair market value of lot 4 in 1983 was $ 1,178,000. In support of their position, each party has produced appraisals and testimony of experts who based their opinions as to fair market value on comparable sales with adjustments that they deemed appropriate. Since respondent has the burden of proof, we look first to the appraisal and testimony of respondent's expert, John S. Cullen (Cullen), offered in support of $ 1,178,000 as the fair market value at the time of the sale of lot 4 to petitioners. In evaluating Cullen's position, we have taken into account, in a rebuttal context, the appraisals and testimony of petitioners' experts Dana and Kline, *116 giving less weight to Dana's views in light of the gap between his 1983 appraisal and the larger value adopted by petitioners herein. Before dealing with the reservations we have about Cullen's specific comparables, we will comment on certain elements which apply generally to Cullen's position. Cullen determined that the highest and best use of lot 4 was for assemblage with the larger adjacent parcel, namely, lots 1, 2, and 3, for commercial retail use. While the theory of assemblage is oftentimes an important factor in determining value, see United States v. Powelson, 319 U.S. 266, 275-276 (1943); McGovern v. New York, 229 U.S. 363, 372 (1913), we are not persuaded that it should be applied in a case such as this where lots 1, 2, 3, and 4 are owned by petitioners and lots 1, 2, and 3 are already developed. It seems to us that Cullen's approach would require us to value lot 4 based on a hypothetical sale from petitioners to themselves, a frame of reference which is incongruous to say the least. Alternatively, we would have to assume that the entire parcel, including all four lots and the buildings, was for sale -- a far cry from reality *117 -- and determine the fair market value of the parcel and the contribution of lot 4 to that value. The fact is that assemblage, which Cullen hypothesizes, has already been accomplished, and the question is the extent to which the sale price of lot 4 to an outside party would be affected, if at all, upwards or downwards by the abutting lots 1, 2, and 3, and the activities being conducted thereon. We find Cullen's approach deficient in several other respects: (1) Cullen failed to take into account the impact of the public use district restriction, his position being that an outside party would automatically succeed to the public parking use "grandfathered" to petitioners. See supra p. 5. We find it unnecessary, in the context of the issue before us, to make a determination as to the precise monetary impact of this restriction. We are satisfied, however, that there was, at least, a question as to the legal situation and that the lack of certainty as to how that situation would be resolved was an element which Cullen should have taken into account. (2) We have a similar difficulty with Cullen's failure to take into account the Bradlees and Rix lease restrictions and his blithe *118 assumption that those restrictions did not run with the land and therefore would not be binding on a purchaser of lot 4. The fact that Stop & Shop found it necessary to pay $ 150,000 to be released from the restriction in the Rix lease confirms our reservation in this respect. [7] Here again, we find it unnecessary to place a precise monetary value on the impact of the lease restrictions. It is sufficient, for the purposes of this case, to conclude that those restrictions constituted an element which Cullen should have taken into account. (3) Cullen assumed that the necessary curb cuts to provide direct highway access to lot 4 could be made. Here again, the availability of one or two curb cuts under existing restrictions and the degree to which permission in respect of those cuts could have been readily obtained from the appropriate governmental authorities was at least open to question. While we again place no precise monetary value *119 on the impact of this element, we are satisfied that Cullen should have taken it into account. Against the foregoing background, we turn to a consideration of Cullen's comparables. Nine separate sales of property in and around Falmouth were considered by Cullen. However, for purposes of this case, we will focus our analysis on the five sales which Cullen stated were most comparable to lot 4. They are as follows: Unit price Unit price Before After
Property
Purchase Size
adjustments
adjustments
Location
Price
(Sq.Ft.)
(Per Sq. Ft.)
(Per Sq. Ft.)
(1) 105 Davis Straits
$ 264,166
36,817
$ 5.68
$ 6.81
(2) 248 Worcester Court
150,000
22,468
6.68
6.68
(3) 111 Teaticket Highway
155,000
44,910
3.45
5.69
(4) 80 Davis Straits
250,000
91,083
2.74
4.25
(5) 56 Davis Straits
125,000
30,907
4.04
6.06
The last three parcels were also dealt with as comparables by Dana or Kline. Cullen's first and second comparable sales were improved properties at the time of sale. This makes a true comparison between lot 4, unimproved at the time of sale, and the two improved comparables, tenuous at best. Cullen made only a minor downward adjustment *120 to the sales price of the first comparable in respect of the restaurant building ($ 55,000 of the $ 264,166 purchase price) without taking into account any going-concern value attaching to the business of the restaurant which presumably was included in the sale. We have no evidence that the purchase price did not include some amount for that value, an element which we think was highly likely in view of the fact that the restaurant has been enlarged and is currently in operation. Under these circumstances, we think Cullen's adjustment was insufficient. With respect to Cullen's second comparable, no adjustment was made to the purchase price to reflect the value of the sizable house on the property at the time of sale. It is difficult to believe that such a structure, which remains on the property at present, had no value. There are additional flaws in Cullen's evaluation of comparable number 1 and comparable number 2. First, without explanation, Cullen makes an adjustment to his first comparable for lot 4's "desirable corner location". The logic behind this adjustment escapes us as comparable number 1 is located on the opposite corner from lot 4. We are given no evidence which *121 would lead us to conclude that one corner was in any respect a more beneficial location than the other. Moreover, Cullen makes an adjustment to his first comparable for its inferior size and frontage as compared to lot 4. Again, we have difficulty understanding his reasoning behind such an adjustment in light of the fact that the first comparable enjoys substantial frontage as a corner lot and in light of the fact that smaller lots normally sell at an increased cost per foot. See Estate of Baggett v. Commissioner, T.C. Memo. 1991-362; Higgins v. Commissioner, T.C. Memo. 1990-103; Alpern Trust v. Commissioner, T.C. Memo. 1988-200. While there are undoubtedly situations in which a larger parcel would sell at a higher square foot value than a comparable smaller parcel located in the same proximate area, as a general rule, the smaller parcel would command a higher square foot value. We are not convinced that the fact that lot 4 was adjacent to Teaticket Plaza justifies an exception to the general rule. With respect to his second comparable, Cullen makes a 10-percent adjustment for location which is clearly warranted considering *122 lot 4's corner location. However, Cullen makes additional 10-percent adjustments for size and frontage and for visibility. We consider the total of the three adjustments, i.e., 30 percent, excessive in light of the fact that there appears to be an overlap between visibility on the one hand and location and frontage on the other. Cullen makes a further upward adjustment to his second comparable for its smaller size, which, for reasons stated above, see supra p. 15, has not been shown to be appropriate. Moreover, Cullen fails to mention or take account of the fact that this comparable was purchased by an abutter, a circumstance that often results in a higher purchase price of the property. [8]
Cullen made the following adjustments to the sale price of his third comparable, otherwise known as the Burger King property, which give us pause: *123 (1) Upward adjustment of 15 percent for inferior location, (2) upward adjustment of 10 percent for inferior size and frontage, (3) upward adjustment of 20 percent for easement encumbering the property, and (4) upward adjustment of 10 percent for inferior visibility and access. Cullen's determination that the Burger King property is an inferior location as compared to lot 4, and his corresponding upward adjustment of 15 percent in respect thereof, is completely unsupported by the record. The property is directly in front of the Falmouth Mall, has frontage on Route 28, and is in close proximity to lot 4. There appears to be no disadvantage in the location as compared to a location adjacent to Teaticket Plaza on the same section of Route 28. As to Cullen's adjustment for size and frontage, we find that a downward, rather than an upward, adjustment in respect of the property's smaller size is appropriate for the reason previously stated. Some upward adjustment to account for the property's inferior frontage is appropriate, however, in light of the fact that lot 4 enjoys frontage along two roadways as a result of its corner location. We are not satisfied, however, that the net adjustment *124 for these two elements should be as large as 10 percent. So far as the easement encumbering the property is concerned, the record is inconclusive as to the degree to which it was advantageous or disadvantageous to a prospective purchaser. We are left with the conviction, however, that if an upward adjustment were appropriate, 20 percent is too high. Cullen's adjustment of 10 percent in respect of inferior visibility and access is unsupported, especially in light of the fact that the property fronts on Route 28 and has two curb cuts (entrance and exit locations). Cullen's fourth comparable, otherwise known as the McMenamy property, is located south of lot 4 on Route 28. No discussion of his adjustments is necessary in light of the fact that his determination of a $ 4.25-per-square-foot value for the property, as applied to lot 4, produces a fair market value of $ 801,613.75, an amount insufficient to activate the 6-year limitation period provided by section 6501(e)(1)(A). See supra p. 9. We are constrained to note, however, that the 15-percent adjustment for location and a further 15-percent adjustment for size and frontage or a total of 30 percent appear unduly large and *125 that the 5-percent adjustment for skillful negotiation is open to question. The record is far from adequate to support Cullen's adjustment with respect to the last element -- an element which, in any event, we find so speculative as to make its quantification questionable. Cullen's fifth comparable, also located south of lot 4 on Route 28, was improved by two structures described as "marginal improvements." Cullen made the following adjustments which are open to question: (1) Upward adjustment of 15 percent for inferior size and frontage, and (2) upward adjustment of 5 percent for condition of sale (otherwise described as skillful negotiation). As previously stated, a downward, rather than an upward, adjustment on account of the comparable's smaller size is appropriate. See supra p. 15. With respect to the adjustment for skillful negotiation, our previous comment on this element applies. Finally, we note that Cullen made no downward adjustment for the improvements. In sum, without determining the precise amount of the fair market value of lot 4, we conclude that such value is not only substantially less than $ 1,178,000 but also that respondent has failed to carry his burden *126 of proof that such value exceeded the minimum amount of $ 944,669 necessary to lift the bar of the statute of limitations. See supra p. 9. Although concededly not determinative, an analysis based on the value of the Stop & Shop lease [9] provides support for our conclusion. We calculate that value as follows based upon the net rent instead of the gross rent as used by respondent's valuation engineer, see supra pp. 6-7, with certain adjustments as indicated: [10]
Annual Net
Factor
Payment in
Income
at 9%
Advance [11]
$ 50,000
9.928972
= $ 496,449 X 1.09
$ 541,129
We note that the above calculation assumes that *127 the entire $ 50,000 annual rent is attributable to lot 4 and that only the debt service on the $ 2,500,000, borrowed by petitioners to construct the building, represented the rental value of the building. We also note that the 9-percent interest rate appears to be well below the market interest rate in 1983. To the above $ 541,129 figure we add the discounted value of the land to petitioners at the end of the lease term, based on the 26 years and 9-percent rate, in order to afford respondent the benefit of every element that might enter into a determination of fair market value but without deciding that the inclusion of such a discounted value is correct. We calculate such discounted value to be $ 125,331 ($ 1,178,000 X .106393). Again giving respondent every possible benefit, we will add the $ 150,000 payment by Stop & Shop to Rix, although such payment would appear to have been as much, if not more, for the use of the building as for the land. It is for this latter reason that we see no necessity to add an amount for any payment which might have had to be made to Bradlees if the lease transaction had been with a third party not associated with Bradlees, whose operations might *128 have been considered a violation of the Bradlees lease restriction. In this connection, we have not taken into account, nor did respondent's valuation engineer take into account, the element of renewability of the lease pursuant to the renewal clause therein. Such an element is simply too speculative to be considered, as is the element relating to the fluctuation in fair market value of lot 4 at the end of the lease from above or below respondent's $ 1,178,000 figure. The total amount of the above calculations is $ 816,460 ($ 541,129 plus $ 125,331 plus $ 150,000), an amount well below the $ 944,669 necessary to avoid the application of the 3-year period of limitations. In this connection, we note that the calculations of Dana and Kline, based upon the lease and mortgage, produced a value of $ 470,000 (Dana) and $ 530,000 (Kline). We hold that the deficiency notices were untimely. Decisions will be entered for petitioners.
Footnotes
1. All statutory references are due to the Internal Revenue Code as in effect for 1983, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. 50 percent of the interest due on the deficiency.↩
3. The issues in this case relate solely to dealings that occurred between Herbert Carver and Gerard Drucker and Atlantic. Therefore, unless otherwise indicated, use of the term petitioners shall refer to Herbert Carver and Gerard Drucker individually.↩
4. Sec. 6501(e)(1)(A) provides in pertinent part: SEC. 6501(e). Substantial Omission Of Items. -- * * * (1) Income taxes. -- In the case of any tax imposed by subtitle A -- (A) General rule. -- If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
5. The parties disagree as to what constitutes the correct amount of gross income stated in petitioners' 1983 income tax returns for purposes of sec. 6501(e)(1)(A)↩. Petitioners contend that total receipts from the sale of sec. 1231 property, without diminution, are included in gross income. Respondent argues that only the difference between total receipts from the sale of sec. 1231 property and the taxpayers' basis in that property is included in gross income. Under petitioners' view, the value of lot 4 would have to exceed $ 1,042,377 as to the Carvers and $ 1,030,685 as to the Druckers, to make the 6-year statute of limitations applicable. Under respondent's view, the value of lot 4 would have to exceed $ 956,584 as to the Carvers and $ 944,669 as to the Druckers to activate the 6-year statute. In light of our ultimate conclusion, we need not resolve this issue.
6. Respondent's valuation engineer arrived at this figure by taking the annual payments under the lease, including not only the $ 50,000 received by petitioners but also $ 341,177 of annual debt service, and multiplied this amount by a discount factor of 9 percent for 26 years. The use of 26 instead of 25 years is unexplained.↩
7. No payment to Bradlees was necessary because Bradlees was owned by Stop & Shop.↩
8. See Estate of Burckhard v. Commissioner, T.C. Memo. 1984-389↩ (buyer might be willing to pay more for property adjacent to that which he already owns).
9. The record contains no evidence which would cause us to conclude that the lease was not an arm's-length transaction. ↩
10. Cullen refused to acknowledge that such an analysis had even an indirect bearing on the determination of the fair market value of lot 4. ↩
11. Respondent's valuation engineer apparently took into account the fact that the annual rent was payable in advance.↩