# United States Tax Court

T.C. Memo. 2024-60

EXCELSIOR AGGREGATES, LLC, BIG ESCAMBIA VENTURES, LLC, TAX MATTERS PARTNER, ET AL.,[1]
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket Nos. 20608-18, 7097-19, 7703-19.

Filed May 30, 2024.

———————

*Michael Todd Welty, Lyle B. Press, Macdonald A. Norman, Samantha M. Porter, Michael B. Coverstone, Daniel B. Wharton, David W. Foster, Merima Mahmutbegovic, Andrew W. Steigleder, Nathaniel S. Pollock,* and *Daniel A. Rosen,* for petitioner.

*Edward A. Waters, Peter T. McCary, Jason P. Oppenheim, Stephen A. Haller, Christopher D. Bradley, Alexandra E. Nicholaides, Russell Scott Shieldes,* and *Christopher A. Pavilonis,* for respondent in Docket Nos. 20608-18 and 7703-19.

*Peter T. McCary, Jason P. Oppenheim, Stephen A. Haller, Christopher D. Bradley, Russell Scott Shieldes,* and *Christopher A. Pavilonis,* for respondent in Docket No. 7097-19.

———————

[1] The following cases are consolidated herewith: Barnes-Escambia Properties, LLC, Big Escambia Ventures, LLC, Tax Matters Partner, Docket No. 7097-19; and Alabama S&G, LLC, Big Escambia Ventures, LLC, Tax Matters Partner, Docket No. 7703-19.

**[\*2]**                                   TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................... 2

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 3

FINDINGS OF FACT ..................................................................... 5

I.    S&G Mining in Escambia County...................................... 6

II.   Assembly of the Big Escambia Tract ............................... 9

III.  Enter Greencone ............................................................. 12

IV.   Enter Conservation Saves .............................................. 16

V.    Preparing for and Executing the Syndications ............... 17

VI.   Granting the Easements ................................................. 19

VII.  Appraisals ...................................................................... 20

VIII. Tax Returns and IRS Examination ................................. 22

IX.   Trial................................................................................ 23

      A.    Respondent's Experts............................................. 23

            1.    Abner Patton................................................. 23

            2.    Michael Rogers ............................................ 25

      B.    Petitioner's Experts................................................ 26

            1.    Edmundo Laporte ......................................... 26

            2.    Steven Hazel................................................ 27

            3.    Robert Wombwell.......................................... 28

OPINION.................................................................................... 28

I.    Burden of Proof................................................................ 28

II.   Valuation......................................................................... 29

[*3] A. "Before" Values of the ASG and the EAG Parcels ................. 31

    1.   Actual Transactions Involving the Subject
        Properties ................................................................... 31

    2.   Other Valuation Methods .............................................. 32

    3.   Highest and Best Use .................................................... 33

    4.   Sales Comparison Methodology ..................................... 38

    5.   Historical Valuation of S&G Properties ........................ 40

    6.   Petitioner's Arguments ................................................. 43

  B.   Value of the BEP Parcel ....................................................... 48

## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*:  These consolidated cases are a subset of 13 related cases involving charitable contribution deductions claimed for conservation easements and/or fee simple interests in Escambia County, Alabama.[2]  We will refer to the 13 cases as the Big Escambia Group, and we will refer to the 13 parcels that were the subject of the contributions as the Big Escambia Tract or Tract.  The Tract was in rural Alabama. The partnerships that donated the property interests carved from the Tract claimed aggregate charitable contribution deductions in excess of $187 million.

The partnerships in these consolidated cases are Excelsior Aggregates, LLC (Excelsior or EAG), Alabama S&G, LLC (Alabama S&G or ASG), and Barnes-Escambia Properties, LLC (Barnes-Escambia or BEP).  The Internal Revenue Service (IRS or respondent) disallowed charitable contribution deductions in excess of $30 million reported on their partnership returns for the tax year ending December 31, 2014. EAG and ASG donated conservation easements on their parcels and shortly thereafter donated the encumbered fee simple interests in those same parcels.  BEP did not grant an easement but donated an unencumbered fee simple interest in the property it held.  The IRS disallowed the deductions claimed, in whole or in part, as follows:

---

[2] References to "Escambia County" are to Escambia County, Alabama, unless otherwise indicated.

| [*4] | Easement Deduction Claimed | Fee Simple Deduction Claimed | Total Charitable Contribution Claimed | Total Charitable Contribution Allowed |
|------|------|------|------|------|
| EAG | $12,525,000 | $4,175,000 | $16,700,000 | $693,000 |
| ASG | 11,215,000 | 3,735,000 | 14,950,000 | 810,000 |
| BEP | N/A | 2,070,000 | 2,070,000 | 1,060,000 |

In all three cases the appraisals supporting the claimed deductions were prepared by Clayton Weibel. His appraisals of the two conservation easements were predicated on his assertion that the "highest and best use" (HBU) of each parcel was commercial sand and gravel (S&G) mining. Employing that assumption, he opined that the fair market value (FMV) of the EAG property, consisting of 301.20 acres, was $16.70 million, or $55,445 per acre, before granting the easement. He opined that the FMV of the ASG property, consisting of 384.83 acres, was $14.95 million, or $38,848 per acre, before granting the easement.[3]

We set these three cases for trial in Atlanta, Georgia, as "test cases" for the Big Escambia Group. Through a stipulation to be bound filed in each of the ten related cases, the parties have agreed that those cases will be resolved consistently with the outcomes of the three test cases. Mr. Weibel was unavailable to testify in December 2022. We accordingly held a partial trial with the intention of conducting a further trial if and when he became available to take the stand.[4]

In the meantime, we directed the parties to file briefs addressed solely to the valuation questions. In many cases of this type, the donor conveys an easement to a land trust but retains ownership of the underlying property. In that scenario, we typically must determine the value of the property before and after the easement is granted, then subtract the latter from the former to calculate the easement's value. Treas. Reg. § 1.170A-14(h)(3)(i); *see, e.g.*, *Browning v. Commissioner*, 109 T.C. 303,

---

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[4] In a joint status report filed November 13, 2023, the parties informed the Court that, if Mr. Weibel were called as a witness, he "is currently expected to invoke his Fifth Amendment privilege in these consolidated cases with respect to all matters." In a joint status report filed April 4, 2024, the parties represented that, "absent a grant of immunity, Mr. Weibel remains unavailable to testify."

[*5] 315, 320–24 (1997); *Hughes v. Commissioner*, T.C. Memo. 2009-94, 97 T.C.M. (CCH) 1488, 1490.

A less nuanced analysis may be adopted here. BEP conveyed no easement but rather donated an unencumbered fee simple interest in the property it held. ASG and EAG, which did convey easements, contributed to the same donee, during the same year, fee simple interests in the easement-encumbered parcels. In each case, therefore, the donee received during the taxable year 100% of the real property interests within each parcel, which equates to the parcel's "before" value. The "before" value of the parcels thus determines the total allowable charitable contribution deduction. We hold that the "before" values of the ASG, the EAG, and the BEP parcels (Subject Properties), and hence the charitable contribution deductions allowable to the three partnerships, are as follows:

|  | *Total Allowable Deduction* |
| --- | --- |
| EAG | $693,000 |
| ASG | 810,000 |
| BEP | 1,975,000 |

FINDINGS OF FACT

The following facts are derived from the pleadings, 15 Stipulations of Facts with attached Exhibits, numerous trial Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial. The three partnerships—Excelsior, Alabama S&G, and Barnes-Escambia—are Georgia limited liability companies (LLCs) classified as TEFRA partnerships for their short taxable periods ending December 31, 2014.[5] Big Escambia Ventures, LLC (BEV), the petitioner in each case, is the tax matters partner (TMP) of each partnership (and of the partnerships in the ten related cases).[6] All four entities had their principal places of business in Georgia when the Petitions were timely filed.

Some of petitioner's fact witnesses were important players in the "syndicated conservation easement space," including the promoters who organized the transactions and helped market the deals to

---

[5] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit process for many partnerships, including those involved here.

[6] Although this Opinion addresses three consolidated cases, we will refer to "petitioner" in the singular because BEV is the TMP of all three partnerships.

[*6] investors.[7]  Other witnesses had invested in easement deals or acted as professional advisers to the promoters.  Many of these witnesses had a direct or indirect stake in the outcome of these cases.  While generally showing good recall of many facts from the 2012–2014 period, they sometimes expressed inability to recall certain facts about matters that might be regarded as unhelpful to petitioner's position.  Because of these witnesses' interest in the outcome and selective inability to recall pertinent facts, the Court has been required to make credibility determinations.

I.    *S&G Mining in Escambia County*

Escambia County lies along the southern border of Alabama, immediately above the western end of the Florida panhandle.  The Subject Properties are along or near Big Escambia Creek, a tributary of the Conecuh River, which flows southwest through the county and then into Florida.  Nearby population centers are Atmore and Flomaton, each situated along the Florida border.  Atmore is 20 miles to the southwest of the Subject Properties; Flomaton is roughly 25 miles due east of Atmore.  Escambia County, Florida, at the western tip of the panhandle, lies directly below Escambia County.  The map below shows the location of these cities.

---

[7] "Promoter" is a loaded term in this area because of the penalty imposed by section 6700(a) for "promoting abusive tax shelters."  In this Opinion we use the term "promoter" in its ordinary sense, making no determination as to whether the sponsors of the transactions at issue were persons subject to the civil penalty under section 6700(a), a question that is not before us.

[*7]



Escambia County is a relatively rural county with abundant timberland. It experienced a population decline during 2000–2010; as compared with other Alabama counties, it had relatively low per capita income and population growth during 2010–2014. As of 2014, employment in the construction industry in Escambia County and nearby areas had not fully recovered from the Great Recession, which was not kind to real estate values in the southeastern United States.

Because of its geological formations and ancient riverbeds, certain parts of the county have been the subject of S&G mining since at least the 1950s. The Alabama S&G parcel, at the northwest corner of the Big Escambia Tract, had been heavily mined, and much of the easily accessible S&G had been removed. Evidence of this earlier mining activity appears in 70 lakes and ponds, the product of rainwater filling the excavated mining pits over many years. The Excelsior parcel, roughly four miles southeast of the Alabama S&G parcel, is heavily forested and was mined to a lesser degree.

[*8]   At trial we heard testimony from several witnesses who had considerable experience doing S&G mining in Escambia County and nearby areas.  Michael Campbell grew up working on his grandfather's S&G mine in Escambia County, Florida.  He personally mined much of the Alabama S&G parcel during 1995–1999.  He explained in detail the specific areas he had mined, many of which had been mined before he got there.

Mr. Campbell estimated that he had mined 80 of the most promising acres of the Alabama S&G parcel.  He explained that he was basically "cleaning up what they did not . . . mine."  By this he meant that he was extracting S&G that earlier miners had left behind because their equipment or technology was less advanced.

Mr. Campbell explained that he generally "didn't fool with" the portions of the Alabama S&G parcel that had been exploited by earlier miners.  As he put it: "There was nothing there. . . .  There wasn't any rock, any sand in there [and] we couldn't make money with it."  He did some exploratory drilling in the previously mined areas but concluded that "there's nothing out there for me to get."  He abandoned his lease on the Alabama S&G parcel in 1999, believing that he "had mined out most of the sand and gravel that could be economically mined."

Mr. Campbell subsequently commenced S&G mining on two parcels that he purchased in 2004 from Molpus Land (formerly Scott Paper Co.).  These parcels, totaling 254 acres, were on Big Escambia Creek about 17 miles north of the Alabama S&G parcel.  Mr. Campbell paid $806 per acre for the 108-acre parcel and $645 per acre for the 146-acre parcel.  He began operations there in 2005 and commenced S&G production in 2007.

In 2007 Mr. Campbell purchased a 40-acre parcel that served to connect the two parcels described above.  He used this third parcel to store "overburden," that is, worthless mud and sand produced during the dredging process.  He paid $2,000 per acre for this new parcel, a price he said was "more than it [was] worth."

In 2013 and 2014 Mr. Campbell extended his S&G mining activities by purchasing two parcels from Rayonier, a large forest products company.  These parcels (totaling roughly 561 acres) were situated on Big Escambia Creek, adjacent to (and north/northeast of) the parcels described in the two preceding paragraphs.  Mr. Campbell paid $1,880

[*9] per acre for the 240-acre parcel and $2,200 per acre for the 321-acre parcel.

Another experienced miner was Paul Peed, who joined with his brother in 2007 and 2008 to purchase an S&G mining operation near Atmore, roughly 20 miles southwest of the Subject Properties. Mr. Peed explained that he had relatively few competitors because it was hard to make money in this business: "Nobody wanted to be in the sand and gravel business. You'd go broke." He noted that Vulcan Materials, a large national company, had an S&G mining operation about a mile away from his location. But "they closed that mine down. . . . They just put the lock on the gate one day and went away."

In 2014 Cleveland Campbell (a relative of Michael Campbell) served as president of American Concrete Supply (ACS). ACS was a ready-mix concrete business operating in Escambia County and neighboring counties. He also served as president of South Alabama Materials (SAM), which produced S&G and supplied it to ACS.

Beginning in 2008 SAM mined S&G on two parcels in Escambia County and on two properties in neighboring Conecuh County. One of these parcels (Cedar Creek) was off Highway 31 before it reaches Brewton, Alabama, about 15 miles east of the Subject Properties. SAM paid roughly $1,000 per acre for the Cedar Creek parcel, which it mined during 2009–2013. In 2020 SAM purchased a parcel adjacent to the Cedar Creek parcel, on which it planned to commence S&G mining. For that parcel it paid about $2,000 per acre.

During 2014 Mr. Peed's company (P&R Mining), Cleveland Campbell's company (SAM), and a third mining company (WPR Minerals, Inc. (WPR)) produced S&G in Escambia County. During 2014, P&R Mining produced a million tons of S&G, roughly 13% of the entire S&G production in Alabama that year. SAM in 2014 produced 159,976 tons of sand and 114,072 tons of gravel, or 274,048 tons in toto. WPR, a small operator, produced 550 net tons of S&G in 2014.

II.     *Assembly of the Big Escambia Tract*

Frank Barnes started *Pro Bass Magazine* in 1971 and sold the business in 1979 for a sizeable profit. He then moved to Columbus, Georgia, and embarked on a long career as a real estate investor. He estimated that he had bought and sold "half a billion dollars of real estate" after moving to Georgia. He was an experienced and knowledgeable real estate investor.

**[\*10]**  Beginning in the 1990s and continuing into the early 2000s, Mr. Barnes began acquiring land in Escambia County.  He recalled that he had purchased the first parcel, comprising roughly 600 acres, for $400 per acre.  Over the years he purchased numerous other parcels, in bits and pieces, and this assembly eventually became the 4,608-acre Big Escambia Tract.[8]  He explained that these properties "were for sale the day that I bought them.  That's what I do for a living."

Although Mr. Barnes was chiefly interested in harvesting timber, he knew that the Big Escambia Tract had previously been mined and he believed that it held potential for extracting S&G.  Sometime after 2005 Barnes Real Estate Brokerage, an affiliated entity, prepared a 30-page brochure advertising a 240-acre parcel for sale as a "gravel mine."  This parcel was within the Tract on Big Escambia Creek, adjacent to (and northwest of) the EAG parcel.

The brochure informed potential buyers that 58 boreholes had been drilled on the 240-acre parcel.[9]  On the basis of the borehole results, a geologist reportedly estimated that roughly 7.26 million tons of S&G could be recovered from a 225-acre section of that parcel.  The brochure stated (inaccurately) that the "[o]wners have a current mining permit issued by Alabama Department of Industrial Relations" and advised that "all that is necessary is to transfer permits" to the buyer, which the owners felt "reasonably confident" could be accomplished.[10]

Beginning in 2005 Mr. Barnes actively marketed this and other portions of the Big Escambia Tract for their S&G potential.  As part of

---

[8] The parties in their filings and Stipulations often refer to the Tract as comprising 4,680 acres.  But the record indicates that the 12 parcels upon which conservation easements were granted totaled 3,897.74 acres.  Adding to this acreage the 710.15-acre parcel held by BEP produces a total acreage of 4,607.89, which we round to 4,608.

[9] Borehole drilling is the process of drilling a well as part of a geotechnical investigation or environmental site assessment.  Specialized drilling rigs with powerful pneumatic pistons drive drill bits through soil and bedrock to create a narrow well up to 100 meters deep to gather samples of soil, sand, gravel, rock, and water at different depths.  The samples are tested in a laboratory to determine their physical properties or to assess levels of chemical constituents or contaminants.

[10] The evidence established that, as of October 17, 2013, Mr. Barnes and his entities lacked several permits from the State of Alabama and the Army Corps of Engineers that would have been needed to commence S&G mining on the ASG and the EAG parcels.  The partnerships to which those parcels were contributed secured no permits of any kind.  Mr. Barnes testified that he once had a mining permit but that it had expired.

**[*11]** his marketing strategy, he dug test holes and placed gravel he found in piles visible to passers-by along public roads. He credibly testified that the property "was well exposed to the market" during this entire period. He said that "at least a dozen different companies looked at the property when [he] marketed it."

In 2008 Mr. Barnes sold a 1,974-acre portion of the Big Escambia Tract to a mining professional named Brooks Delaney. Mr. Delaney was a very sophisticated investor with financial backing from a private equity firm that specialized in minerals investment. This portion was situated along Big Escambia Creek, a few miles southeast of the Alabama S&G parcel. Mr. Delaney paid $8.49 million, or $4,301 per acre, for this parcel, which he purchased through RLF Baldwin III, LLC.

The 1,974-acre parcel contained more land than Mr. Delaney required for his S&G mining operation. He drew up plans to subdivide the property and sell off parts he did not need, for prices he hoped might range from $4,000 to $8,500 per acre. Although a few buyers nibbled, he was unable to sell a single acre.

Mr. Delaney conducted S&G mining operations on this section of the Big Escambia Tract for several years. But he encountered recurring problems with wood debris in the S&G layers.[11] Manufacturers typically will not purchase S&G that is contaminated with wood impurities, which adversely affect the structural soundness of asphalt and concrete. Finding the wood debris difficult to remove using standard manufacturing processes, Mr. Delaney resorted to manual removal, which was inefficient and expensive. Mr. Peed visited the site in 2012 and recalled that "they were getting wood debris in their gravel and couldn't figure out how to get it out." He described this as "a terrible mess" and explained that he "had never seen nothing like it" and did not know why "it was in that product so bad."

Mr. Delaney spent several million dollars trying to solve this problem, hiring outside experts and experimenting with different

---

[11] The wood debris resulted from tree branches falling into the ancient riverbeds many centuries ago. The wood gradually decomposed into chunks and particles, some the size of gravel and others the size of coarse or fine sand. A common method for recovering S&G is to wash the raw material through a series of sieves or screens with openings of various sizes: The top screen catches the large gravel, the next screen catches smaller gravel, and next screen catches coarse sand, etc. The problem is that each screen would catch not only the sand or gravel it was designed to catch, but also wood debris of comparable size.

[*12] equipment and techniques. He ultimately concluded that he could not profitably mine S&G from the 1,974-acre parcel, and the private equity firm that was backing the investment agreed with him. He attempted to sell the property but could find no buyers. In April 2012 he transferred the property back to Mr. Barnes by deed in lieu of foreclosure. At trial he noted that the S&G business in Alabama and Florida was in poor shape during 2012–2014 because "the construction market just took so long to rebound" after the 2008 recession.

The map below shows the location of the parcels that were purchased by Cleveland Campbell, Brooks Delaney, and Michael Campbell (other than the property he acquired for $2,200 per acre). The map indicates how their parcels were located vis-à-vis the ASG and the EAG parcels (referenced as 1 and 2, respectively). And the legend shows the per-acre prices they paid for their parcels.



MAP LEGEND

| 1 | Alabama S&G, LLC |
|---|---|
| 2 | Excelsior Aggregates, LLC |
| 3 | Cleveland Campbell: $1,000/acre |
| 4 | Brooks Delaney: $4,301/acre |
| 5 | Michael Campbell: $646-$806/acre |
| 6 | Michael Campbell: $2,000/acre |
| 7 | Michael Campbell: $1,880/acre & royalty |
| 8 | Cleveland Campbell: $2,000/acre, 2020 tax year |

III. *Enter Greencone*

After receiving Mr. Delaney's acreage back on April 11, 2012, Mr. Barnes once again owned the entire Big Escambia Tract. He continued

[*13] to market the Tract during 2012 and 2013. But he encountered no serious potential buyers until 2013, when he was approached by Greencone Investments (Greencone).

Greencone was formed in 2012 by Russell Bennett and Carlton Walstad. Both were sophisticated real estate investors. They originally envisioned Greencone as a vehicle for investing in timber properties. But Greencone quickly shifted its focus to conservation easements. During 2013 it sponsored two syndicated conservation easement transactions—Merriwether Aggregates and Rattlesnake Aggregates—both with S&G mining as the supposed "highest and best use" of the properties on which the easements were granted.

In mid-2013 a broker named Chris Whitley had the listing for the Big Escambia Tract. He and Mr. Barnes showed the property to Mr. Walstad. They discussed prior S&G mining on the Tract and the potential for future S&G extraction.

Messrs. Bennett and Walstad did a very modest amount of investigation into the S&G potential of the Big Escambia Tract. They did not commission any drilling to secure additional borehole samples. They did not talk to anyone who had previously mined S&G in the area. And they did not interview anyone who knew anything about S&G mining in Escambia County. In essence, their "due diligence" consisted of visiting the property once.

On October 17, 2013, Messrs. Bennett and Walstad sent Mr. Barnes a letter of intent offering to purchase the entire 4,608-acre Tract for $9.50 million, or $2,062 per acre. The purchase price was to be paid as follows: a $2.50 million cash downpayment to be paid by yearend 2013 and a $7 million promissory note. The agreement provided that 600 acres would be released to Greencone upon receipt of the cash downpayment. The balance of the acreage would be released only as payments were made on the note.

Two weeks later Messrs. Bennett and Walstad formed BEV as the vehicle for implementing conservation easement transactions using the Big Escambia Tract. On November 15, 2013, Mr. Barnes and his wife accepted Greenecone's offer, agreeing to sell the Big Escambia Tract to BEV for $9.50 million. Mr. Barnes indicated that he was pleased with the sale price. He was under no economic pressure at that time and was under no compulsion to sell the property. He was a savvy investor who

[*14] was fully aware of (and had touted) the property's S&G potential. It is undisputed that the transaction was an arm's-length sale.

At this point, Greencone did not have the $2.50 million needed to close on the Big Escambia Tract. To raise the required funds Messrs. Bennett and Walstad intended to sponsor a syndicated conservation easement transaction involving the acreage that would be released to BEV upon remission of the cash downpayment. The vehicle for that deal was going to be Big Escambia Sand & Gravel LLC (Big Escambia S&G).

Greencone circulated promotional materials, offering investors 96% of the units in Big Escambia S&G for $6.30 million. It stated that members who purchased units could vote to pursue one of three options: granting a conservation easement, developing an S&G business, or holding the land for appreciation. But the latter two options were not discussed in any detail; instead, the promotional materials focused exclusively on the alleged tax benefits of the proposed transaction. The offering materials included a "conservation easement benefit summary," stating that an investor would receive a Federal income tax deduction of $3.17 for every dollar invested "if the conservation easement proposal is elected." The Big Escambia S&G transaction never closed because Greencone was unable to attract enough investors to complete the offering.

Around this time, Messrs. Bennett and Walstad hired Joe (Jody) Butler to appraise the 600-acre parcel. The record includes a January 14, 2014, draft appraisal that bears Mr. Butler's signature. The draft report, which recites S&G mining as the HBU, concludes a value of $1.93 million for the parcel, or roughly $3,217 per acre. Mr. Butler based this valuation on sales of four comparable parcels, two in Escambia County and two in nearby Dooley County. All of these parcels were vacant land.

Mr. Butler was instructed to stop his appraisal and never completed his report. There seem to have been three reasons for this. First, his "before" value conclusion—$3,217 per acre—was nowhere near the values that Greencone needed to generate tax deductions of the magnitude investors desired. Second, it was clear that an appraisal could not get to the desired valuation using comparable land sales; a "discounted cash flow" (DCF) method was the only possible route. The email traffic suggests that Mr. Butler may have started down a DCF path, but that was not his area of expertise. Third, the Greencone team that had hired Mr. Butler was moving to a new alliance with Frank Schuler and

[*15] Matthew Ornstein, who had their own appraisers (including Mr. Weibel) with whom they were comfortable.

In early 2014 Greencone was still trying to come up with the money needed to close on the Big Escambia Tract. Mr. Barnes had already extended the closing date several times, and it was now set for February 28, 2014. To secure the funds needed to close by that date, Greencone sought assistance from Messrs. Schuler and Ornstein, who soon became its business partners.

Messrs. Schuler and Ornstein were real estate professionals known for their experience in syndicated conservation easements. In 2014 they formed Conservation Saves, LLC (CS), which promoted the sale of membership interests in partnerships that granted conservation easements. When Messrs. Ornstein and Schuler joined forces with Greencone, they formed a partnership in which they held an indirect 60% interest and Messrs. Bennett and Walstad (through Greencone) held a 40% interest. In essence, the partnership constituted a merger of Greencone's easement business into CS.

The four promoters executed a memorandum of understanding (MOU) reciting their ownership interests in this new partnership. The MOU expressed their understanding that CS would acquire a property—viz., the Big Escambia Tract—that would appraise at a value between $132 million and $183 million before any conservation easement was granted. When the MOU was executed, no one had performed an appraisal valuing the Big Escambia Tract at anything close to this value range.

The MOU recited the promoters' expectation that CS would sell interests to investors for $30 to $40 million, promising them a charitable contribution tax deduction of $4.389 for every $1 invested. Investor proceeds of $30 million would correspond to a $132 million appraisal ($4.389 × $30 million = $131,670,000). Investor proceeds of $40 million would roughly correspond to the higher appraisal estimate ($4.389 × $40 million = $175,560,000).

When asked at trial how he could have posited in advance a deduction-to-investment ratio of $4.389 to $1, before any appraisals had been performed, Mr. Schuler said that appraisals were basically irrelevant to the tax write-off they were offering. The promised ratio of 4.389 to 1, he explained, was driven by "the market," that is, by the magnitude

[*16] of the tax deductions being offered by other promoters of conservation easements.

On February 26, 2014, Messrs. Bennett and Walstad executed an operating agreement for BEV that laid out the four promoters' ownership interests. Those interests were held by various LLCs at different times. In economic terms, however, Messrs. Schuler and Ornstein owned 60% of BEV, and Messrs. Bennett and Walstad owned 40% of BEV. At all relevant times the four promoters were BEV's ultimate managers.

On February 28, 2014—the closing date for sale of the Big Escambia Tract—Mr. Barnes and his wife, as joint tenants, formed BEP and contributed the Tract to it by warranty deed. That same day, the Barneses sold to BEV a 99% interest in BEP for $9.50 million. The terms of the latter transaction were amended on August 22, 2014, to state that the Barneses, for that price, had sold to BEV a 96% interest in BEP. This amendment was stated to be "effective as of February 28, 2014."

IV. *Enter Conservation Saves*

Operating through CS, Messrs. Ornstein and Schuler planned to subdivide the Big Escambia Tract into 13 parcels, on 12 of which easements would be granted. Those 12 parcels were given alphabetical monikers—**A**labama S&G, **B**E Creek, **C**edar Land, **D**eep Creek, **E**xcelsior, etc. The plan was to syndicate the parcels one by one, starting with A; once deal A was fully subscribed, the promoters would syndicate deal B, and so on. Parcels A through L were all syndicated during the latter half of 2014.

The principals of CS testified that the Big Escambia Tract was subdivided in this way to facilitate marketing to investors. Their plan was to offer units to "sophisticated investors" under security rules that capped the number of investors for any given deal at 99. By making 12 separate offerings rather than one, CS could attract close to 1,200 investors rather than 99. This would reduce the minimum investment to a more modest sum, making the deals more "affordable."

We find that subdividing the Big Escambia Tract in this way had another explanation, or at least another advantage. Each of the 12 parcels was going to be appraised on the theory that its HBU was S&G mining. To generate valuations high enough to support the promised tax deductions, the appraisals would have to project extremely large volumes of S&G production from each parcel annually. Collectively, the

[*17] projected annual S&G production from the Tract as a whole (per the appraisals) could conceivably exceed the total annual S&G production from the State of Alabama. Given the law of supply and demand, that level of production would raise questions about the economic feasibility of S&G mining as the HBU of the entire Tract. The promoters thus found it prudent to subdivide the Tract into 12 smaller parcels, each of which could be appraised on the unspoken assumption that none of the others would be used for S&G mining.

In June 2014 Messrs. Walstad and Bennett hired Marvin Blethen to prepare a report analyzing the feasibility of an S&G mining operation on the ASG parcel and a separate report analyzing the feasibility of an S&G mining operation on the EAG parcel. Mr. Blethen's reports, which utilized the DCF method, were attached to and cited in Mr. Weibel's appraisals of the two parcels. Petitioner did not call Mr. Blethen to testify at trial.

In an email dated July 25, 2014, Mr. Blethen cautioned Mr. Bennett about the need to consider the impact of competing S&G operations when performing a DCF analysis. He emphasized that his DCF calculations for the ASG and the EAG parcels "are not mutually exclusive." He indicated that, if the plan was to commence S&G operations on both parcels simultaneously, "[y]ou can combine [the results] only if you reduce your tonnage for each by one-third and run the DCF on each and [then] combine."

V. *Preparing for and Executing the Syndications*

As of August 2014, BEP owned the entire Big Escambia Tract, and BEV owned 96% of BEP. Between August and November 2014, BEP subdivided 3,898 acres of the Tract into 12 parcels and contributed title to each parcel to a distinct property company or "PropCo." Each PropCo, initially owned by BEP, would ultimately be owned by an investment company or "InvestCo," and units in the InvestCos would be marketed to investors. Each PropCo would grant a conservation easement on its parcel, and the investors would receive, through the InvestCos, pro rata shares of the tax deductions claimed by the PropCos for the easements.

For each InvestCo, CS prepared informational packages for distribution to prospective investors. These packages were distributed between July 22 and December 8, 2014. Each informational package informed its recipient, in bold text: "**For every $1.00 contributed to InvestCo, the new member would receive a charitable**

**[\*18] contribution deduction of approximately \$4.39 (\$4.38596 to be exact) that should save the new member approximately \$2.00 in taxes.**"

The offering materials stated that members who purchased units in an InvestCo could vote to pursue one of four options: granting a conservation easement, developing an S&G business, leasing the property to a third party for mining, or holding the land for appreciation. But the latter three options were not discussed in any detail. Rather, the promotional materials focused exclusively on the \$4.39-to-\$1 tax write-off that would allegedly result from granting the easement.

Each information package contained a "Conservation Easement Example" showing that a \$100,000 investment would provide a new member with "Estimated Total Tax Savings" of \$200,000. An Excel spreadsheet captioned "AGI Analysis" allowed prospective investors to input their respective tax rates "to see the net tax effect of the conservation easement." No similar tools were provided to enable investors to gauge the financial benefits of the other three "options."

The offering materials relating to ASG stated that "the appraised value of the Property [will be] in the approximate amount of \$14,950,000." That value was based on a "preliminary appraisal" by Mr. Weibel, consisting of a two-page report dated July 11, 2014. Mr. Weibel came up with the same "before value" for ASG in his final appraisal dated November 10, 2014. *See infra* p. 20. The "preliminary appraisal" for EAG, at \$16.7 million, was likewise identical to the value appearing in Mr. Weibel's final appraisal.

Alabama S&G was the first PropCo on the syndication list. On August 12, 2014, BEP distributed 96% of its interest in ASG to BEV, with the remaining 4% interest being distributed to Mr. and Mrs. Barnes. BEV then transferred 95% of its interest in ASG to the ASG InvestCo. The offering period for purchasing membership units in the ASG InvestCo closed on August 24, 2014, and the offering was fully subscribed.

BEV received sale proceeds of \$3,233,865 from the ASG offering. Investors thereby acquired a 95% ownership interest in the ASG InvestCo. BEV's cost basis in the ASG parcel was \$842,463, its allocated share of the \$9.5 million paid for the Big Escambia Tract. The difference between the sale proceeds and BEV's cost basis, or \$2,391,402, includes a large premium paid to the promoters for the transaction.

[*19] Excelsior was the fifth PropCo on the syndication list. On September 19, 2014, BEP distributed 96% of its interest in EAG to BEV, with the remaining 4% interest being distributed to Mr. and Mrs. Barnes. BEV then transferred 95% of its interest in EAG to the EAG InvestCo. The offering period for purchasing membership units in the EAG InvestCo closed on December 8, 2014, and the offering was fully subscribed.

BEV received sale proceeds of $3.1 million from the EAG offering. Investors thereby acquired a 95% ownership interest in the EAG InvestCo. BEV's cost basis in the EAG parcel was $626,992, its allocated share of the $9.5 million paid for the Big Escambia Tract. The difference between the sale proceeds and BEV's cost basis, or $2,473,008, includes a large premium paid to the promoters for the transaction.

All in all, BEV received proceeds of $36,164,421 from selling to investors membership units in the 12 InvestCos. When the dust settled, BEP was left with 710 acres, consisting of ten largely noncontiguous parcels of varying sizes whose physical characteristics were deemed unsuitable for conservation. This residual portion of the Big Escambia Tract was not the subject of an easement transaction but was donated in fee simple to the land trust that received the easement contributions.

VI. *Granting the Easements*

Every investor in each of the 12 InvestCos voted for (or was deemed to have voted for) the conservation easement option. There is no evidence that any investor had any interest in actually pursuing the "S&G mining" option, which would have required massive additional infusions of capital (or extensive borrowing) and would have deferred any return on their investment for years. Petitioner supplied no evidence that any investor in any similar transaction, from 2008 onwards, had ever voted to pursue an option other than the conservation easement option. The Court finds as a fact that the development options described in the promotional materials were window dressing designed to obscure the tax-shelter nature of the transactions.

On November 24, 2014, ASG granted a conservation easement over its 384.83-acre parcel to the National Wild Turkey Federation Research Foundation (Foundation), a "qualified organization" within the meaning of section 170(h)(3). The deed of easement was recorded on December 3, 2014. On December 15, 2014, EAG granted a conservation easement over its 301.20-acre parcel to the Foundation, and that deed

[*20] of easement was recorded the same day. On various dates during late 2014, the other ten PropCos granted to the Foundation, and timely recorded, conservation easements over their parcels.

On December 22, 2014, BEP conveyed to the American Upland Land Trust (Trust)—a subsidiary and disregarded entity of the Foundation—an unencumbered fee simple interest in the residual 710 acres deemed unsuitable for conservation. On the same day, ASG and EAG conveyed to the Trust encumbered fee simple interests in their respective 384.83-acre and 301.20-acre parcels. The other ten PropCos did the same. Accordingly, at yearend 2014, the Foundation and its affiliate together owned 100% of the Big Escambia Tract, with 3,898 of those acres encumbered by easements.

VII.  *Appraisals*

CS hired Mr. Weibel, with whom it had worked previously, to value the easements. In preparing his appraisals he assumed that S&G mining was the HBU of the ASG parcel, the EAG parcel, and the other ten parcels on which easements had been granted. For each parcel he prepared a DCF analysis estimating future income from a hypothetical S&G production business, employing various assumptions about recoverable volumes of S&G, future pricing of S&G, capital expenses, ordinary business expenses, discount rates, and so on.

On the basis of the DCF analysis, Mr. Weibel concluded that the FMV of the ASG parcel before granting the easement was $14.95 million (or $38,848 per acre) and that the FMV of the EAG parcel before granting the easement was $16.70 million (or $55,445 per acre). He determined that these parcels were worth $3,735,000 and $4,175,000, respectively, after granting the easements. Subtracting the "after" values from the "before" values, he determined that the FMVs of the easements were $11,215,000 and $12,525,000, respectively. Using sales of allegedly comparable land, he determined that the FMV of the residual 710 acres held by BEP was $2.07 million.

The following table summarizes the total charitable contribution deductions that were supposedly available to the 13 partnerships, according to Mr. Weibel's appraisals:

| [*21]<br><br>PropCo | Acreage | Before Value | Before Value per Acre | Easement Deduction | Fee Simple Deduction | Total Deduction |
|---|---|---|---|---|---|---|
| Alabama S&G | 384.83 | $14,950,000 | $38,848 | $11,215,000 | $3,735,000 | $14,950,000 |
| BE Creek | 405.62 | 14,950,000 | 36,857 | 11,215,000 | 3,735,000 | 14,950,000 |
| Cedar Land | 359.68 | 14,950,000 | 41,565 | 11,215,000 | 3,735,000 | 14,950,000 |
| Deep Creek | 334.56 | 15,200,000 | 45,433 | 11,400,000 | 3,800,000 | 15,200,000 |
| Excelsior | 301.20 | 16,700,000 | 55,445 | 12,525,000 | 4,175,000 | 16,700,000 |
| Flomaton Pits | 310.01 | 16,300,000 | 52,579 | 12,225,000 | 4,075,000 | 16,300,000 |
| Great Plains | 321.64 | 15,900,000 | 49,434 | 11,925,000 | 3,975,000 | 15,900,000 |
| Hill Top S&G | 331.58 | 15,800,000 | 47,651 | 11,850,000 | 3,950,000 | 15,800,000 |
| Industrial S&G | 353.68 | 15,900,000 | 44,956 | 11,925,000 | 3,975,000 | 15,900,000 |
| JC Land | 299.17 | 15,900,000 | 53,147 | 11,925,000 | 3,975,000 | 15,900,000 |
| Knat Creek | 236.31 | 14,850,000 | 62,841 | 11,137,000 | 3,713,000 | 14,850,000 |
| Long Branch | 259.46 | 13,900,000 | 53,573 | 10,425,000 | 3,475,000 | 13,900,000 |
| BEP | 710.08 | 2,070,000 | 2,915 | — | 2,070,000 | 2,070,000 |
| **TOTALS** | **4,607.82** | **$187,370,000** | **—** | **$138,982,000** | **$48,388,000** | **$187,370,000** |

When joining forces in early 2014, Messrs. Bennett, Walstad, Schuler, and Ornstein executed an MOU reciting their understanding that CS would acquire a property—viz., the Big Escambia Tract—that would appraise at a value between $132 million and $183 million. Just a few months previously, Messrs. Bennett and Walstad had contracted to purchase the entire Tract for $9.5 million, and the transaction closed at that price in February 2014. Petitioner has supplied no evidence that any acreage within the Tract appreciated significantly between November 2013 and December 2014, much less that it had appreciated by $177 million, or 1,872%. Yet remarkably, Mr. Weibel's appraisals for the combined acreage came in at $187 million—$4 million *higher* than the top of the range upon which the promoters had agreed up front.

[*22] VIII.  *Tax Returns and IRS Examination*

EAG filed Form 1065, U.S. Return of Partnership Income, for its short taxable year ending December 31, 2014.  On that return it claimed a charitable contribution deduction of $12,525,000 for donating the easement to the Foundation and a charitable contribution deduction of $4,175,000 for donating the encumbered fee simple interest to the Trust. The total deduction claimed for the EAG parcel, $16.70 million, was equal to its alleged "before" value as determined by Mr. Weibel.

ASG filed Form 1065 for its short taxable year ending December 31, 2014.  On that return it claimed a charitable contribution deduction of $11,215,000 for donating the easement to the Foundation and a charitable contribution deduction of $3,735,000 for donating the encumbered fee simple interest to the Trust.  The total deduction claimed for the ASG parcel, $14,950,000, was equal to its alleged "before" value as determined by Mr. Weibel.[12]

BEP filed Form 1065 for its short taxable year ending December 31, 2014.  On that return it claimed a charitable contribution deduction of $2.07 million for donating to the Trust an unencumbered fee simple interest in the residual 710 acres.  The other ten PropCos filed Forms 1065 claiming charitable contribution deductions parallel to those claimed by ASG and EAG.

The IRS commenced examinations of the returns filed by all 13 partnerships that make up the Big Escambia Group.  At the conclusion of the audits, the IRS issued timely Notices of Final Partnership Administrative Adjustment (FPAAs) to BEV, the TMP for each partnership. The adjustments determined in the three consolidated cases were as follows:

- The FPAA issued to Excelsior was dated July 27, 2018.  It disallowed in toto the $12,525,000 deduction claimed for the easement, concluding that EAG had failed to establish "that all the requirements of [section] 170 have been satisfied."  Assuming arguendo that those requirements had been satisfied, the FPAA determined that the easement's value did not exceed $271,000.  With respect to the donated fee simple interest, for which Excelsior had reported a deduction of $4,175,000, the IRS allowed a deduction of

---

[12] ASG on its return claimed an additional charitable contribution deduction of $54,074 for "cash endowment" fees.  The IRS did not disallow that portion of the deduction.

[*23] only $422,000. This followed from its determination that the "before" value of the EAG parcel—that is, its value before the easement was granted—was at most $693,000, or $2,301 per acre. The IRS thus determined that the aggregate charitable contribution deduction allowable for donating to the Foundation all rights to the parcel—the easement plus the residual fee simple interest—could not exceed $693,000 ($271,000 + $422,000). Finally, the IRS determined a 40% penalty for gross valuation misstatement under section 6662(h) or (in the alternative) a 20% penalty under other provisions of sections 6662 and 6662A.

- The FPAA issued to Alabama S&G was dated February 14, 2019. It disallowed in toto the $11,215,000 deduction claimed for the easement, concluding that ASG had failed to establish "that all the requirements of [section] 170 have been satisfied." With respect to the donated fee simple interest, for which ASG had reported a deduction of $3,735,000, the IRS allowed a deduction of only $810,000, or $2,105 per acre. Finally, the IRS determined a 40% penalty for gross valuation misstatement under section 6662(h) or (in the alternative) a 20% penalty under other provisions of sections 6662 and 6662A.

- The FPAA issued to Barnes-Escambia was dated February 6, 2019. It determined that the FMV of an unencumbered fee simple interest in the residual 710 acres, for which BEP had reported a deduction of $2.07 million, was only $1.06 million, or $1,493 per acre. The IRS allowed a charitable contribution deduction in that amount. The FPAA also determined a 20% accuracy-related penalty under section 6662(a).

IX.   *Trial*

BEV timely petitioned this Court for review of the three FPAAs. We tried the consolidated cases in Atlanta, reserving the possibility of a future hearing to take testimony from Mr. Weibel. During the trial we heard testimony from several expert witnesses.

A.   *Respondent's Experts*

1.   *Abner Patton*

Abner Patton, respondent's mining expert, is a licensed professional geologist in Alabama. He has more than 40 years of experience in the fields of geology and hydrology. He has worked on numerous

[*24] projects evaluating subsurface mineral assets, including S&G reserves.  We recognized him as an expert in the evaluation and valuation of mineral resources.  We found him to be very knowledgeable about the S&G mining business and found his testimony credible.

Mr. Patton conducted an extensive investigation into the availability of S&G reserves on the ASG and the EAG parcels.  His work included physical inspection of the properties, studying historical aerial imagery (which showed the location of prior mining sites), reviewing documents created by the Geological Survey of Alabama, conducting a drilling program on the ASG and the EAG parcels (with boreholes to a depth of 50 feet), inspecting the borehole samples (and the results of previous borehole drilling), and reviewing the laboratory sieve analysis of the tested samples.  Because the ASG and the EAG parcels were restricted by conservation easements when he did his work, he was permitted to drill boreholes only near existing roadways.  However, the locations he chose for the borehole drilling were logically chosen to shed light on the S&G reserves of the parcels as a whole.

Mr. Patton concluded that at least 276 acres (or 72%) of the ASG parcel had been previously mined for S&G.  He based this conclusion on aerial photographs, interviews with miners who had worked there previously, and the presence of irregular surface features associated with prior S&G mining—numerous ponds, undulations, trenches, and piles of sand, gravel, and overburden.  His drilling program and laboratory analysis identified no S&G reserves on the ASG parcel of sufficient quality, quantity, and distribution to be considered commercially marketable resources.

Mr. Patton's research revealed that the EAG parcel had been mined as early as 1957 but to a lesser extent than the ASG parcel.  He concluded that the EAG parcel had some remaining S&G deposits but that 60 years of mining had significantly depleted the reserves that could be recovered commercially.  Two boreholes revealed a massive amount of overburden—e.g., mud, clay, and tree debris—above the gravel layer.  He concluded that removing, transporting, and storing this overburden would be an extremely costly undertaking.  A third borehole sample suggested that 37,000 tons of gravel might be recovered from a 5-acre portion of the EAG parcel.  But Mr. Patton found that this material did not meet the Alabama Department of Transportation gradation specifications necessary to qualify for use in its projects, thus limiting the potential marketability of this gravel.

[*25] Mr. Patton acknowledged that the EAG parcel had "limited" S&G resources, but he concluded that these resources were not "of sufficient quality, quantity, thickness, and distribution to be considered as marketable reserves." Specifically, he determined that the parcel had remaining reserves of no more than 111,749 tons of marketable S&G. Of that total, 74,538 tons, or 66.7%, consisted of sand, a much less valuable resource.

### 2. *Michael Rogers*

Michael Rogers, respondent's appraisal expert, is a certified real property appraiser licensed in Alabama. He has appraised hundreds of properties during his career, including income-producing properties, raw land, and conservation easements. We recognized him as an expert in real estate appraisal. We found him to be a credible witness whose appraisal methodology was sound.

To determine the "before" values of the ASG and the EAG parcels, Mr. Rogers employed a sales comparison approach, finding income-based methods inapt because insufficient data existed to permit a reliable estimate of future cashflows. He evaluated the physically possible, legally permissible, financially feasible, and maximally productive uses of both parcels. He concluded that the HBU of each parcel, before granting any easement, was silviculture, recreation, and limited residential use, with potential mining of remaining S&G reserves for local consumption (e.g., road repair and landscaping).

Mr. Rogers identified five properties (ranging in size from 101.27 to 557 acres) as comparable to, and as having the same HBU as, the ASG and the EAG parcels (which comprised 348.83 acres and 301.2 acres, respectively). Four of these properties were in Alabama (Atmore, Flomaton, Bradley, and Brewton) reasonably close to the Big Escambia Tract. Each property generally resembled the ASG and the EAG parcels in terms of its soil characteristics, topography, and zoning.

The five comparable properties were sold between September 2011 and November 2014 at prices ranging from $1,436 to $2,498 per acre. After adjusting these sale prices for plot size, road access, frontage, and differences in potentially recoverable timber and subsurface minerals, he concluded a "before" value for the ASG parcel of $615,000, or $1,598 per acre, as of November 24, 2014, the date the easement was granted. Making a different adjustment relating to the estimated timber value on the EAG parcel, he determined its "before" value to be

[*26] $550,000, or $1,826 per acre, as of December 15, 2014, the date that easement was granted.

The BEP parcel, comprising 710.15 acres, differed from the other parcels because it consisted of ten largely noncontiguous sub-parcels varying in size, location, and physical characteristics. Mr. Rogers noted that one of these sub-parcels (#1) included an 8,000-square-foot warehouse and attached dwelling. He selected as comparable five sales of properties ranging in size from 550 to 1,196 acres. These properties were sold between November 2010 and November 2015 at prices ranging from $800 to $3,617 per acre. After making various adjustments and separately valuing the improvements to sub-parcel #1, Mr. Rogers determined the FMV of the BEP parcel to be $1.6 million—roughly $1,800 per acre for the land, plus $330,000 for the improvements.

B. *Petitioner's Experts*

Petitioner did not attempt to support the "before" values claimed for the ASG and the EAG parcels using a sales comparison approach. And they did not cross-examine Mr. Rogers regarding his selection of comparable sales. Rather, petitioner urged that the "before" values of the ASG and the EAG parcels should be determined by hypothesizing the creation of a commercial S&G business on each parcel, estimating the future cashflows from that business, and discounting those cashflows to present value. This methodology is commonly referred to as a "discounted cash flow" or DCF approach.

1. *Edmundo Laporte*

Edmundo Laporte is a licensed engineer in Alabama with 30 years of experience in the mining industry. We recognized him as an expert in the evaluation and valuation of minerals. Because he has no expertise as an appraiser of real property, we struck from his reports several passages in which he offered opinions concerning the FMV of the ASG and the EAG parcels.

Mr. Laporte prepared a "feasibility study" addressing the possibility of creating S&G mining businesses on the ASG and the EAG parcels. From his evaluation of borehole testing analysis, he assumed that, after "reach[ing] peak production capacity in 2018 (Year 3)," each parcel

[*27] would produce 400,000 tons of S&G annually.[13]  He estimated the volumes of each grade of S&G that might be produced and made assumptions about the future prices at which each grade of product would sell.

On the expense side, Mr. Laporte assumed that the investor partnerships would defray the initial capital costs of creating each business—roadbuilding, surveying, permitting, site clearance, installation of utilities, etc.  He assumed that these initial capital costs, consisting of two dozen line items, would total about $6.4 million for the two partnerships.  Mr. Laporte assumed that the partnerships would hire an established mine operator, on a cost-plus basis, to perform the actual S&G extraction.  This required that he estimate hundreds of such costs—from wages and health benefits to capital recovery to repairs and maintenance—and the profit demanded by the operator.  He assumed that a hypothetical contractor would perform the S&G extraction work in exchange for a profit equal to 15% of its total costs.

### 2.    *Steven Hazel*

Steven Hazel is a certified public accountant and appraiser.  He offered opinions as to the FMV of the ASG and the EAG parcels immediately before the easements were granted.  Because Mr. Hazel was not licensed to appraise real property in Alabama, we recognized him as a general expert in valuation.

Mr. Hazel posited that the HBU of each parcel was S&G mining.  He allegedly considered a "sales comparison" approach to value the parcels, but he testified that he "could not find any, what we considered comparable properties to use as a proxy."  Instead, he assumed that each parcel would be developed into an S&G mining business and estimated the future cashflows from that business.

---

[13] Mr. Laporte did not conduct any borehole testing of his own.  Rather, he based his analysis largely on borehole tests the promoters had commissioned several years previously.  No expert witness testified concerning the manner in which those earlier borehole results were obtained.  There is no evidence that those earlier boreholes were drilled in locations that would yield representative results regarding the S&G content of the parcels as a whole.  In a Motion in Limine filed November 25, 2022, petitioner sought admission into evidence—for the truth of the matters asserted therein—reports prepared at the promoters' request in 2014 by mining consultants, some of whom discussed pre-2015 borehole tests.  By Order dated December 21, 2022, we denied that Motion because the reports were hearsay statements of professionals whom petitioner declined to call as expert witnesses in these cases.

**[\*28]** Mr. Hazel adopted Mr. Laporte's estimates regarding the recoverable volumes of S&G and the future revenues and operating expenses of the hypothetical mining operations. Assuming that S&G mining would continue on each parcel for 33–34 years, he hypothesized that each business would generate future net revenues of roughly $60 million. He applied a 13.5% "pass-through entity premium" and reduced the estimated future cashflows to present value using an average discount rate of 10.5%. He opined that the "before" values of the ASG and the EAG parcels, corresponding to the discounted present value of their S&G reserves, were $9.4 million (or $24,426 per acre) and $10.9 million (or $36,189 per acre), respectively.

### 3. *Robert Wombwell*

Robert Wombwell is a senior managing director at Valbridge Property Advisors. He is a member of the Appraisal Institute and is licensed to perform real estate appraisals in Alabama. We recognized him as an expert in real estate appraisal.

To value the 710 residual acres donated by BEP, Mr. Wombwell prepared 11 separate appraisals, concluding that sub-parcel #1 should be valued as two separate tracts: a 6.78-acre unimproved tract and a 4.79-acre tract including the 8,000-square-foot warehouse with attached dwelling. For each appraisal he used the "sales comparison" approach. All of the sales he selected as comparable involved property in Alabama.

Mr. Wombwell determined the total FMV of the 710 acres to be $1,975,000–$375,000 higher than the FMV determined by Mr. Rogers. The bulk of the difference between their valuations appears traceable to Mr. Wombwell's employment of a separate HBU for each sub-parcel, which led him to select higher value comparable sales.

## OPINION

### I. *Burden of Proof*

The IRS's determinations in a notice of deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

**[\*29]** Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect [that] factual issue," § 7491(a)(1), and must have "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A).

We need not decide who bears the burden of proof because the parties have provided sufficient evidence to enable us to decide the disputed valuation questions by a preponderance of the evidence. *See Estate of Bongard v. Commissioner*, 124 T.C. 95, 111 (2005); *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 100 T.C.M. (CCH) 581, 583, *aff'd*, 493 F. App'x 944 (10th Cir. 2012). We have discerned no "evidentiary tie" on any relevant factual question. *See Knudsen v. Commissioner*, 131 T.C. 185, 188 (2008) (citing *Blodgett v. Commissioner*, 394 F.3d 1030, 1039 (8th Cir. 2005), *aff'g* T.C. Memo. 2003-212), *supplementing* T.C. Memo. 2007-340.

II.   *Valuation*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time of the gift. *See* Treas. Reg. § 1.170A-1(c)(1).[14] The regulations define FMV as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* subpara. (2). Valuation is not a precise science, and the value of property on a given date is a question of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

The FMV of real property should reflect its HBU on the valuation date. *See Mitchell v. United States*, 267 U.S. 341, 344–45 (1925); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). A property's HBU is the most profitable use for which it is adaptable and needed, or likely to be needed in the reasonably near future. *Olson v. United States*, 292 U.S. 246, 255 (1934);

---

[14] Deductions generally are not allowed for gifts of property consisting of less than the donor's entire interest, but there is an exception for a "qualified conservation contribution." *See* § 170(f)(3)(B). For purposes of this Opinion, respondent does not dispute that the gifts at issue were "qualified conservation contributions." The sole issue currently before the Court concerns the proper valuation of the contributions.

**[\*30]** *Symington v. Commissioner*, 87 T.C. 892, 897 (1986). If different from the current use, a proposed HBU thus requires both "closeness in time" and "reasonable probability." *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985). We exclude from consideration any proposed uses that "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable." *Olson*, 292 U.S. at 257.

To support their positions regarding valuation the parties retained experts who testified at trial. We assess an expert's opinion in the light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment. *Parker*, 86 T.C. at 561. We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts). And we may determine FMV from our own examination of the record evidence. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

"Market prices" typically do not exist for conservation easements. *See Symington*, 87 T.C. at 895. For that reason, courts usually value easements indirectly using a "before and after" approach, seeking to determine the reduction in property value attributable to the easement. *See* Treas. Reg. § 1.170A-14(h)(3)(i); *cf. Browning*, 109 T.C. at 320–24; *Hughes*, 97 T.C.M. (CCH) at 1490. Under that approach, the value of the easement is deemed equal to the FMV of the real estate before the easement was granted ("before" value), minus the FMV of the real estate as encumbered by the easement ("after" value).

The "before and after" method assumes that the donor, after contributing the easement, retains the property that the easement encumbers. That was not the pattern in the cases before us: ASG and EAG contributed to the same donee, during the same year, both a conservation easement and the encumbered fee simple interest in that same parcel. And BEP contributed a fee simple interest in its 710-acre parcel, unencumbered by any easement.

**[\*31]** In all three cases, therefore, the donee received during the taxable year 100% of the real property interests within each parcel, which equates to the parcel's "before" value. The "before" value thus determines the total allowable charitable contribution deduction in each case. We thus proceed to determine the "before" values of the three parcels.

### A. *"Before" Values of the ASG and the EAG Parcels*

#### 1. *Actual Transactions Involving the Subject Properties*

The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date. *Estate of Newberger v. Commissioner*, T.C. Memo. 2015-246, 110 T.C.M. (CCH) 615, 616–17 (observing that no evidence is more probative of a donated property's FMV than its direct sale price); *see Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 242–43 (1968), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969); *Wortmann v. Commissioner*, T.C. Memo. 2005-227, 90 T.C.M. (CCH) 336, 339–40 (finding that the most persuasive evidence of the property's FMV was the actual sale of the property 17 months before the contribution). The record here includes such evidence.

In October 2013 Messrs. Bennett and Walstad sent Mr. Barnes a letter of intent offering to purchase the 4,608-acre Big Escambia Tract for $9.5 million, or $2,062 per acre. On November 15, 2013, Mr. Barnes and his wife accepted that offer, agreeing to sell the Tract for $9.5 million to an entity designated by Messrs. Bennett and Walstad. The transaction closed on February 28, 2014, with BEV as the designated acquiring entity. But because of an August 2014 amendment, BEV ultimately acquired only a 96% interest in the Tract for the $9.5 million contract price. *See supra* p. 16. This indicates a value of $9,895,833 ($9.5 million ÷ 0.96) for the Tract as a whole, or $2,148 per acre ($9,895,833 ÷ 4,608).

Mr. Barnes stated that he was pleased with the $9.5 million sale price. He was under no economic pressure at that time and under no compulsion to sell the property. He was a savvy investor who was fully aware of (and had touted) the S&G potential of the property. And Messrs. Bennett and Walstad were purchasing the Tract chiefly for what they believed to be its S&G potential. In short, Mr. Barnes was a willing seller, and Messrs. Bennett and Walstad were willing buyers. It is undisputed that the transaction by which BEV acquired a 96% interest in the Big Escambia Tract was an arm's-length sale between parties with full knowledge of relevant facts.

32

**[*32]** This transaction occurred reasonably close in time to the valuation dates. The Barneses accepted the $9.5 million offer in November 2013; the transaction closed at that price in February 2014; and the contract amendment retroactively raising the per-acre price to $2,148 occurred in August 2014. Petitioner has adduced no evidence suggesting that the Big Escambia Tract appreciated meaningfully in value between those dates and the dates on which the easements were granted (in November and December 2014).

Petitioners have likewise adduced no evidence suggesting that acreage in the ASG and the EAG parcels was more valuable than acreage in the Big Escambia Tract generally. Indeed, the average per-acre value of the ASG and the EAG parcels as determined by Mr. Weibel ($46,135) was lower than the average per-acre value he determined for the 12 parcels on which easements were granted ($47,540). *See supra* pp. 20–21. We accordingly find that the price to which the Barneses ultimately agreed—$2,148 per acre for the entire Big Escambia Tract—is probative as to the per-acre value of the ASG and the EAG parcels. We find that this is the best available evidence as to the "before" value of those parcels on the valuation dates.[15]

### 2.    *Other Valuation Methods*

In the absence of actual transactions involving the subject property, courts typically consider one or more of three approaches to determine the property's FMV: (1) the market approach, (2) the income approach, and (3) an asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). We consider these other methods as providing a check on (or confirmation of) the $2,148 per-acre value indicated by the price Greencone paid to acquire the entire Big Escambia Tract.

---

[15] Petitioners contend that the promoters' subdivision of the Tract into 12 parcels and contribution of those parcels to the PropCos was a material change that allegedly generated a huge increase in the property's FMV. This is supposedly so because, even though Messrs. Barnes, Bennett, and Walstad knew the Tract held S&G assets, they "did not know [its] volume, quality, or potential value." We are not persuaded. The subdivision of the Tract did not increase the value of the real estate (as could be true for a residential subdivision), but was done solely to facilitate marketing the conservation easement transaction to investors. *See supra* pp. 16–17. And the "volume, quality, [and] potential value" shown in Mr. Weibel's appraisals—which appear to have been reverse-engineered to generate the values desired by the promoters—can scarcely be used to controvert the evidence supplied by real-world market transactions.

**[*33]** Determining which method to apply presents a question of law. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013).

In the case of vacant, unimproved property, the market approach—often called the "comparable sales" or "sales comparison" method—is "generally the most reliable method of valuation." *Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987) (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)). The comparable sales method determines FMV by considering the sale price realized for similar properties sold in arm's-length transactions near in time to the valuation date. *See ibid.*; *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). Because no two properties are ever identical, the appraiser must make adjustments to account for differences between the properties (e.g., parcel size and location) and terms of the comparable sales (e.g., proximity to valuation date and conditions of sale). *See Wolfsen Land & Cattle Co.*, 72 T.C. at 19. The solidity of an appraiser's valuation "depends to a great extent upon the comparables selected and the reasonableness of the adjustments made." *Id.* at 19–20.

The income method determines FMV by discounting to present value the expected future cashflows from the property. *See, e.g.*, *Chapman Glen Ltd.*, 140 T.C. at 327; *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision). The theory behind this approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income. *See Trout Ranch*, 100 T.C.M. (CCH) at 583. Income-based methods are generally disfavored when valuing vacant land that has no income-producing history. *See, e.g.*, *Chapman Glen Ltd.*, 140 T.C. at 327; *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 324–25 (2012), *supplementing* 131 T.C. 112 (2008), *aff'd in part, vacated in part, and remanded*, 755 F.3d 236 (5th Cir. 2014). That is because the absence of a financial track record makes an income-based method inherently speculative and unreliable.

### 3.    *Highest and Best Use*

The choice of valuation method is influenced in part by the HBU of the subject property. We have defined HBU as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." *Whitehouse Hotel*, 139 T.C. at 331 (quoting

**[\*34]** Appraisal Institute, *The Appraisal of Real Estate* 277 (13th ed. 2008)).

Petitioner's expert, Mr. Hazel, following the lead of Mr. Weibel, determined that the HBU of both parcels was S&G mining. Specifically, he posited a separate S&G mining business on each of the ASG and the EAG parcels, each continuing for 33 to 34 years, each producing 400,000 tons of S&G annually after three years, and each generating total net revenues of roughly $60 million. Respondent's expert, Mr. Rogers, concluded that commercial S&G mining operations were not economically feasible or plausible on either parcel, especially on the scale contemplated by Mr. Hazel. Mr. Rogers determined that the HBU of the parcels before granting the easements was silviculture, recreation, and limited recreational use, with potential mining of remaining S&G reserves for local consumption (e.g., road repair and landscaping). On this point we agree with respondent.

In reaching his HBU determination Mr. Rogers reasonably relied on Mr. Patton's borehole testing and analysis, which revealed multiple areas of concern about the feasibility of a commercial S&G mining business on these two parcels. At least 276 acres (or 72%) of the ASG parcel had been previously mined on a continuous basis over many decades. Those earlier miners would logically have focused on the most promising areas for S&G production and mined out most S&G that could be profitably extracted. Common sense thus supports the conclusion that Mr. Patton reached on the basis of his exploratory drilling program and laboratory analysis—that the ASG parcel contained no S&G reserves of sufficient quality, quantity, and distribution to be considered commercially marketable resources.

The EAG parcel had likewise been heavily mined for 60 years, though less heavily than the ASG parcel. Mr. Patton determined that "sand and gravel resources of limited economic value are present on the Property." But he found the commercially marketable S&G reserves to be severely limited. Two boreholes that he drilled revealed a massive amount of overburden—mud, clay, and tree debris—above the gravel layer. He reasonably concluded that the costs of removing, transporting, and storing this overburden would be prohibitive in relation to the value of the S&G that could be recovered. According to Mr. Patton's testing and analysis, the EAG parcel had remaining marketable S&G reserves of no more than 111,749 tons—a far cry from the 12 million tons (400,000 tons annually for 30 years) implausibly assumed by Mr. Hazel.

[*35] Mr. Rogers analyzed the S&G industry in southern Alabama and the land use patterns in the surrounding area. His discussions with local miners revealed that they regarded S&G mining as a high-risk endeavor with high entry costs. For those reasons, S&G rights were sometimes traded for prices as low as $10 per acre for unmined parcels. Mr. Rogers acknowledged that the ASG and the EAG parcels contained "limited sand and gravel reserves" that buyers would generally view as "a plus for future internal road repairs." But he reasonably concluded that "there is insufficient [S&G] material for the property to be of any interest to a mining operator."

Mr. Rogers's conclusion is consistent with the statements and actions taken by experienced S&G miners in the area. Mr. Peed, who purchased an S&G mining operation 20 miles southwest of the Subject Properties, noted in 2007 and 2008 that "nobody wanted to be in the sand and gravel business" because "[y]ou'd go broke." He testified that Vulcan Materials, a large national company, had closed its nearby S&G mine—presumably concluding that it was not economically feasible to continue operations. Another experienced miner was Michael Campbell, who testified that he had mined 80 of the most promising acres of the ASG parcel between 1995–1999. After determining that he "had mined out most of the sand and gravel that could be economically mined," he abandoned his lease in 1999—concluding that he "couldn't make money with it." He characterized the S&G market in southern Alabama as "guerilla warfare."

Where the asserted HBU of property is the extraction of minerals, the proponent must show the presence of minerals in commercially exploitable volumes and the existence of a market "that would justify [mineral] extraction in the reasonably foreseeable future." *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991); *Cloverport Sand & Gravel Co. v. United States*, 6 Cl. Ct. 178, 198–99 (1984). "There must be some objective support for the future demand, including volume and duration. Mere physical adaptability to a use does not establish a market." *United States v. Whitehurst*, 337 F.2d 765, 771–72 (4th Cir. 1964) (footnote omitted); *see also United States v. 494.10 Acres of Land*, 592 F.2d 1130, 1132 (10th Cir. 1979) ("[I]f the 'future' is beyond or very much beyond the 'near future,' the use becomes speculative.").

In asserting that creation of a commercial S&G mining business was the HBU of each parcel, petitioner relies on Mr. Laporte's "feasibility study" and Mr. Hazel's DCF analysis. We found neither persuasive. Their reports make unreasonable assumptions about the recoverable

[*36] volume of minerals, supply, demand, pricing, and the costs of extraction.

First, Mr. Laporte's assumption that each parcel contained 12 million tons of commercially recoverable S&G—400,000 tons of production annually for 30 years—struck us as highly exaggerated. According to Mr. Patton's testing and analysis, the EAG parcel had remaining S&G reserves of fewer than 112,000 commercially recoverable tons—less than 1% of Mr. Laporte's estimate. And the S&G reserves on the ASG parcel, which had been very thoroughly mined already, were certainly less extensive.[16]

Second, assuming arguendo that Mr. Laporte's reserve estimates were plausible, petitioner failed to show that the market could absorb anything close to this additional supply. In 2014 P&R Mining and SAM held dominant market shares in Escambia County. Together they produced roughly 1.3 million tons of S&G annually, representing more than 90% of the county's S&G production. To absorb the additional 800,000 tons supposed by Mr. Laporte, the annual demand from the local market would have to increase by about 60%. Petitioners offered no credible evidence that such additional demand would materialize "in the reasonably foreseeable future." *See 69.1 Acres of Land*, 942 F.2d at 292.[17]

The area surrounding the ASG and the EAG parcels is primarily rural. Escambia County had a small population and was experiencing minimal growth. As of 2014 demand for S&G in Alabama and the Florida panhandle had not recovered from the Great Recession. In six of the seven relevant counties, fewer residential building permits were issued

---

[16] The tonnages posited by Mr. Laporte were inflated by (among other things) his treating vast amounts of sand as commercially recoverable minerals. Because of its abundance, sand is much less valuable than gravel; price lists of regional operators showed sand selling for as little as 10% of the price of gravel. As evidenced by the huge piles of sand on the ASG parcel, much sand produced by the dredging process cannot be sold and constitutes waste.

[17] The supply/demand imbalance becomes even more acute when one considers that ASG and EAG were just two of the 12 PropCos carved from the Big Escambia Tract, each with S&G mining as its supposed HBU. According to Mr. Weibel's appraisals, each parcel was capable of producing up to 400,000 tons of S&G annually. But the entire S&G production from the State of Alabama in 2014 was only about 8 million tons. Petitioners' original mining expert, Mr. Blethen, cautioned Mr. Bennett that his DCF calculations for the ASG and the EAG parcels "were not mutually exclusive" and that the analysis must consider the impact of competing mines, e.g., by reducing expected tonnages and staggering the start dates for each mine consistent with market demand.

[*37] in 2014 than in 2008. Other indicators of demand, including employment in the construction industry, were likewise below their pre-recession levels.

Even if local demand for S&G were to increase substantially, we are not persuaded that the two new businesses posited by Mr. Laporte would be the likely beneficiaries. The parties agree that the profitability of S&G extraction depends heavily on proximity to customers because of the high costs of transporting S&G to the point of use. Demand is also proportionate to the population base and the growth rate, which in turn depends on vibrant construction activity. S&G mines close to major markets, in short, are more advantageous because they have more customers and lower transportation costs.

P&R Mining and SAM were established local companies with established client bases, and their mines were close to major markets. The ASG and the EAG parcels were much less advantageously situated, and the businesses that would own the hypothetical mines did not yet exist. If demand for S&G were to grow, that demand would likely be met by increased production from the two established operators, both of which had additional production capacity, rather than by new entrants with no track record and higher transportation costs.

Third, the price points that Mr. Laporte estimated for the output of the hypothetical S&G mines exceeded the prices charged by existing competitors. Mr. Laporte's assumed pricing for gravel was roughly 40% higher than the prices charged by SAM, which sold its gravel products in Escambia County for $10 to $11 per ton in 2014. Mr. Laporte's assumed pricing for sand, which was much less valuable than gravel, was as much as 200% higher than existing competitors' pricing. This confirms our conclusion that, if local demand for S&G were to increase, it would be satisfied by lower priced products from existing producers, not by S&G extracted from the ASG and the EAG parcels.

Fourth, respondent points to numerous deficiencies in Mr. Laporte's estimates regarding the costs entailed by the hypothetical mining operations. It is sufficient to mention just a few of these defects. Mr. Laporte provided no credible support for his assumption that a third-party mine operator would agree to perform S&G extraction on a cost-plus basis for more than 30 years for a profit limited to 15% of total costs. Mr. Laporte likewise did not come to grips with Mr. Patton's borehole analysis that showed a massive amount of "overburden" above the

[*38] gravel layer on the EAG parcel—worthless material that would be extremely costly to remove, transport, and store.

Most problematically, Mr. Laporte seriously underestimated the capital costs for the hypothetical S&G businesses, especially for mining equipment. At the prices quoted in his report, the equipment used by the hypothetical mining operator would be near the end of its useful life. But his calculations budgeted no additional capital costs for equipment after year two, even though he projected that the mining activities would continue for over 30 years.

For all these reasons, we reject Mr. Hazel's conclusion that commercial S&G production was the HBU of the ASG and the EAG parcels. *Cf. Savannah Shoals, LLC v. Commissioner,* T.C. Memo. 2024-35, at *39–41 (finding the taxpayer's proposed HBU of an aggregate mine was not financially feasible considering the market demand and existing supply). Rather, the evidence supports Mr. Rogers's determination that the HBU of each parcel, before granting the easements, was silviculture, recreation, and limited residential use, with potential mining of remaining S&G reserves for local consumption.

### 4. *Sales Comparison Methodology*

The ASG and the EAG parcels at yearend 2014 were vacant, unimproved properties. For such properties, the sales comparison methodology is "generally the most reliable method of valuation." *Estate of Spruill*, 88 T.C. at 1229 n.24. Given his HBU determination for these parcels, Mr. Rogers accordingly searched for sales of similarly configured parcels whose primary use would be silviculture, recreation, and residential use, but with some S&G reserves that could be mined for local consumption.

Mr. Rogers selected five sales as comparable, four involving properties within Escambia County. Two of the properties bordered parcels within the Big Escambia Tract. The sales occurred between September 2011 and November 2014 and involved properties ranging in size from 101.27 acres to 557 acres. These properties resembled the Subject Properties in their physical characteristics (e.g., size, topography, and S&G resources), zoning, and conditions of sale.

- Comparable #1 was a 154-acre parcel in Escambia County that sold for $1,623 per acre in September 2011. The parcel had S&G potential similar to that of the ASG and the EAG parcels.

[*39] • Comparable #2 was a 557-acre parcel in Escambia County that sold for $1,436 per acre in September 2011. The parcel was directly adjacent to the ASG parcel on its northwest side.

• Comparable #3 was a 380.47-acre parcel in Escambia County, Florida, that sold for $2,498 per acre in April 2014. The parcel was in an area experiencing speculative housing demand, so it had the potential for conversion to residential use.

• Comparable #4 was a 101.27-acre parcel in Escambia County that sold for $2,000 per acre in October 2014.

• Comparable #5 was a 141-acre parcel in Escambia County that sold for $1,900 per acre in November 2014. It was directly northwest of the EAG parcel, and it abutted the Cedar Land and the Deep Creek parcels within the Big Escambia Tract.

For all five transactions Mr. Rogers analyzed various characteristics of the property sold, including parcel size, shape, location, potential subsurface value contribution, natural amenities, access to paved roadways and utilities, and differences in topography and soil composition. He made adjustments for differences in parcel size, differences in the timing of the sales, and other relevant factors. On the basis of a qualitative analysis, he classified each property as inferior, similar, or superior to the Subject Properties.

Mr. Rogers ranked three of the comparable properties as overall "superior" to the ASG and the EAG parcels. On the basis of these facts and the sales data, he determined the EAG parcel to have a "before" value in the range of $1,600 to $2,000 per acre as of December 15, 2014, the date the EAG easement was granted. Making a slightly different adjustment for potential timber contributions with respect to the ASG parcel, he determined that it had a "before" value in the range of $1,500 to $1,700 per acre as of November 24, 2014, the date the ASG easement was granted. He ultimately reconciled the "before" values of the ASG and the EAG parcels to $1,598 per acre and $1,826 per acre, respectively.

Petitioner did not cross-examine Mr. Rogers on his selection of comparable sales. Nor did it offer any competing "comparable sales" of its own. Instead, both of petitioner's experts took the position that the sales comparison approach "is not applicable" in these cases because of a supposed "lack of data."

[*40]  In urging a "lack of data," petitioner appears to contend that the only "comparable sales" would be sales of properties on which S&G mining businesses were currently operating or about to launch.  This assumes that the HBU of the two parcels was S&G mining—a proposition we have rejected.  More fundamentally, this argument ignores the facts on the ground.  The ASG and the EAG parcels at yearend 2014 were not properties on which S&G mining businesses were currently operating or about to launch.  Rather, both consisted of vacant, unimproved land.  What the ASG and the EAG parcels were comparable to—as Mr. Rogers correctly determined—were other unimproved parcels with similar characteristics, including limited S&G potential.  In short, once the HBU of the two parcels is properly identified, numerous "comparable sales" existed, as Mr. Rogers's report convincingly shows.

The high end of the FMV ranges that Mr. Rogers determined for the ASG and the EAG parcels under the "comparable sales" method was $2,000 per acre.  This value is consistent with what we believe to be the best evidence of the parcels' "before" value, namely, the $9.5 million price Greencone paid for the entire Big Escambia Tract.  That transaction was originally priced at $2,062 per acre, revised in August 2014 to $2,148 per acre.

5.      *Historical Valuation of S&G Properties*

Petitioners vigorously contend that the ASG and the ESG parcels should be valued on the premise that they held significant potential for S&G mining.  Assuming arguendo that S&G mining might be considered their HBU, our valuation conclusion would be roughly the same.  The appropriate "comparable sales" would then be sales of other vacant parcels of land that were acquired for the purpose of conducting S&G mining operations.  *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1371 (11th Cir. 2021).

The record is replete with reliable historical evidence of the prices that knowledgeable buyers paid to purchase acreage with potential for commercial S&G mining.  Petitioner does not contend (and could not plausibly contend) that the ASG and the EAG parcels had any unique features that made them especially valuable.  To the contrary, both properties had already been "mined out" to a significant degree.  Mr. Hazel's assertion that he "could not find any comparable properties to use as a proxy" suggests that he did not look very hard.

[*41] During 2013 and 2014 Michael Campbell purchased two vacant parcels that he intended to use (and did use) for S&G mining. Both parcels were on Big Escambia Creek, just north of the Subject Properties. These parcels, consisting respectively of 240 acres and 321 acres, were roughly the same size as the ASG and the EAG parcels. Mr. Campbell paid $1,880 per acre and $2,200 per acre, respectively, for the two parcels.

SAM, the company headed by Cleveland Campbell, has been mining S&G on multiple properties in Escambia County and neighboring Conecuh County since 2008. SAM purchased Cedar Creek, a property about 15 miles east of the Subject Properties, which it mined for S&G during 2009–2013. It paid $1,000 per acre for that parcel. Prices for land with S&G potential evidently increased only moderately during the next decade. In 2020 SAM purchased, for $2,000 per acre, an adjacent parcel on which it planned to commence S&G mining.

Going further back in time, we find similar per-acre pricing, making a reasonable allowance for inflation. In 2004 Michael Campbell purchased 254 acres on Big Escambia Creek, about 17 miles north of the ASG parcel. The purchase price for the 108-acre parcel was $806 per acre, and the purchase price for the 146-acre parcel was $645 per acre. He commenced S&G mining on those parcels in 2007. In that year, needing land on which to store "overburden," he bought a 40-acre parcel that lay between the original two parcels. He paid $2,000 per acre for the third parcel, a price that he found was "too high." The latter transaction occurred seven years before the valuation dates for the Subject Properties; on the other hand, the S&G market was stronger in 2007 than in 2014, having not yet felt the negative impact of the Great Recession. *See supra* pp. 36–37.

This historical evidence suggests that knowledgeable buyers regarded promising S&G properties in Escambia County as being worth between $1,500 and $2,200 per acre. The only market transaction that might be thought to support a higher value was Mr. Delaney's purchase in 2008 of a 1,974-acre portion of the Big Escambia Tract (located a few miles southeast of the ASG parcel). Mr. Delaney, an experienced mining professional backed by a private equity firm, paid $4,301 per acre for that parcel. That price, as Mr. Delaney testified, turned out to be ill advised.

For several years Mr. Delaney conducted S&G mining on his portion of the Tract. But he encountered an insurmountable problem with

**[\*42]** wood debris in the gravel layers. After spending millions of dollars trying to solve this problem, he concluded that he could not profitably mine S&G from the property. In April 2012 he transferred the property back to Mr. Barnes by deed in lieu of foreclosure.

Mr. Barnes was well informed about Mr. Delaney's struggles and of his conclusion that S&G mining on the 1,974-acre parcel—representing 43% of the Big Escambia Tract—was not financially feasible. Armed with this knowledge, Mr. Barnes entertained no hope of selling the Tract for anything close to $4,301 per acre. After commencing negotiations with Greencone in 2013, he agreed to sell the Tract for a per-acre price less than half the price Mr. Delaney had paid in 2008.

For these reasons, we give the 2008 purchase by Mr. Delaney relatively little weight in determining the "before" value of the ASG and the EAG parcels. Overall, the historical evidence suggests that if S&G mining were thought to be the parcels' HBU, their "before" values would not be significantly higher than the values determined by Mr. Rogers ($1,500 to $2,000 per acre). All of these values are roughly in line with what we have found to be the best evidence of the parcels' FMV: the price Greencone paid to acquire the Big Escambia Tract, including the ASG and the EAG parcels, roughly a year before the valuation date. That price was $2,148 per acre.[18]

In the FPAAs the IRS determined that the "before" value of the ASG parcel was $810,000, or $2,105 per acre, and that the "before" value of the EAG parcel was $693,000, or $2,301 per acre. The average of those values, $2,203 per acre, is higher than the per-acre price that Greencone paid for the Big Escambia Tract. Acknowledging that valuation is not an exact science, we find that the per-acre values determined in the FPAA are supported by the record evidence. We therefore hold that the charitable contribution deductions to which Alabama S&G and

---

[18] Petitioner contends that Mr. Barnes received two offers to purchase the Big Escambia Tract for $4,774 per acre, more than double the price that Greencone eventually offered. But one putative buyer could not come up with financing; the other wanted Mr. Barnes to seller-finance the transaction, which he was unwilling to do. We find that Mr. Barnes regarded both offers as unrealistic; otherwise, he would presumably have pursued one of them and rejected Greencone's lower bid. In any event, unaccepted offers are generally accorded little probative weight in determining FMV. *See Jayson v. United States*, 294 F.2d 808 (5th Cir. 1961); *Estate of Lloyd v. Commissioner*, T.C. Memo. 1996-30, 71 T.C.M. (CCH) 1903, 1915 (citing *Sharp v. United States*, 191 U.S. 341 (1903)).

**[\*43]** Excelsior are entitled are limited to \$810,000 and \$693,000, respectively.[19]

### 6. *Petitioner's Arguments*

Dismissing the sales comparison approach, Mr. Hazel employed the income approach—often called the "income capitalization" method—to determine the "before" values of the ASG and the EAG parcels. He posited that the HBU of each parcel was an S&G mining operation, as supposed by Mr. Laporte, that would derive annual revenues of roughly \$60 million over its 30+ year lifespan. He subtracted the estimated costs of starting up and operating the hypothetical S&G mines and discounted the projected net revenues to present value using an average discount rate of 10.5%. After applying a 13.5% "pass-through entity premium," Mr. Hazel opined that the "before" value of the ASG parcel was \$9.4 million (or \$24,426 per acre) and that the "before" value of the EAG parcel was \$10.9 million (or \$36,189 per acre).

We reject this approach for several reasons, including our determination that S&G mining was not the HBU of the two parcels. The income capitalization method is most reliable when used to determine the value of an existing business with a track record of income, expenses, profits, and growth rates. A historical track record provides real-world inputs that supply a plausible basis for projecting future revenue. *See*

---

[19] A final piece of historical evidence is supplied by the sale proceeds that BEV received from the investors who purchased interests in the ASG and the EAG InvestCos. *See supra* pp. 18–19. We have previously ruled that an investor's purchase of an interest in a partnership whose only significant asset is real estate can be viewed as a "proxy for ownership" of that real estate. *See Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2020-93, 119 T.C.M. (CCH) 1619, 1626; *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368; *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at \*71–72. BEV received sale proceeds of roughly \$3.20 million and \$3.10 million, respectively, from selling 95% interests in ASG and EAG to investors. *See supra* pp. 18–19. If those proceeds were regarded as being paid solely for the real estate held by the partnerships, the proceeds would suggest per-acre prices for the ASG and the EAG parcels of about \$8,800 and \$10,800, respectively. The amounts paid by the investors, however, included very large premiums for the promoters who organized the conservation easement transactions, as well as reimbursing the promoters for the costs they incurred for appraisal fees, legal fees, marketing expenses, and other transaction costs. *See supra* pp. 18–19. Those added charges have nothing to do with the value of the underlying real estate. Indeed, because the investors were interested only in tax deductions, they were likely oblivious to the true value of the real estate. Taken together, these factors considerably reduce the evidentiary value of these transactions. Because the record supplies an ample supply of more reliable historical evidence, we give no weight to the InvestCo offerings.

[*44] *Whitehouse Hotel*, 139 T.C. at 325 (noting that the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings" (quoting *Whitehouse Hotel*, 131 T.C. at 153)).

Referring to the sales comparison method as the "common-sense approach" for valuing vacant land, Mr. Rogers explained that an incomed-based approach would require the appraiser "to deal with so many variables." The appraiser would then need to imagine how the vacant land might be developed into an operating S&G mining business—an inquiry involving hundreds of variables such as capital costs, operating expenses, quality and quantity of S&G produced, future pricing of such products, repair and maintenance expenses, marketing expenses, legal and administrative costs, and discount rate. Mr. Rogers underscored the lack of "supported, verifiable answers" to any of these questions. Lacking reliable data, the appraiser would have to rely on a lengthy series of assumptions, estimates, and guesstimates. Performed under these constraints, the DCF method becomes highly speculative, making it inferior to the sales comparison method, which draws its conclusions from the market.

We agree with Mr. Rogers's assessment that the income approach was too speculative to yield an accurate valuation of the ASG and the EAG parcels. The courts have often noted "the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings." *Pittsburgh Terminal Corp v. Commissioner*, 60 T.C. 80, 89 (1973), *aff'd*, 500 F.2d 1400 (3d Cir. 1974) (unpublished table decision); *see Ambassador Apartments*, 50 T.C. at 243–44 (rejecting real estate valuation premised on the income approach in favor of market value established by recent sales). Absent a financial track record, every input into the DCF analysis necessarily involves speculation. That problem would be at its apogee here—attempting to predict the future revenues and expenses of a nonexistent business for a 30-year period.

When the income approach is used, the Court must examine the plausibility of the critical assumptions made by the appraiser. *See Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, 97 T.C.M. (CCH) 1818, 1820. Each assumption, whether large or small, carries with it "some risk of error." *Whitehouse Hotel*, 139 T.C. at 323. As interdependent assumptions multiply, the risk of error can increase exponentially. We have therefore rejected an expert's use of the income method when "[o]ur own calculations . . . show that relatively minor

[*45] changes in only a few of his assumptions would have large bottom-line effects." *Ibid.*

Mr. Hazel based his DCF analysis largely on the estimates carried over from Mr. Laporte's "feasibility study." As noted *supra* pp. 36–38, Mr. Laporte made unsupported assumptions concerning the recoverable volume of minerals, supply, demand, pricing, and the costs of extraction. He failed to account for the fact that existing S&G operations in the region had substantial price advantages because of their location, existing clients, and established market presence. He failed to address the existing and prospective supply of S&G and its impact on demand. These facts alone warrant rejecting as noncredible the profitability conclusions on which Mr. Hazel's DCF analysis is based.

That said, we note some additional, more technical, flaws in Mr. Laporte's analysis below:

- Mr. Laporte estimated mineral resources of 28 million to 33 million tons of "sand/gravel" on the ASG and the EAG parcels. But gravel is up to ten times more valuable than sand, and his reports make no effort to separate sand soils from gravel soils. He likewise fails to account for less valuable soils (e.g., clay and peat soils) in any meaningful way.

- Mr. Laporte assumed that the ASG and the EAG parcels would sell roughly 50% gravel products and 50% sand products each year. But he and Mr. Patton agreed that the volumes of gravel across the entire acreages were minor in comparison to sand. Our review of the evidence indicates that the S&G reserves of the EAG parcel may have consisted (at best) of 26% gravel content. Assuming that gravel would account for 50% of each parcel's annual sales volume thus seems unreasonable. Moreover, because most of the useful gravel was buried beneath large volumes of useless sand and "overburden," the costs of extracting the gravel would be especially high.

- Mr. Laporte described dozens of products that could be produced from the S&G soils, but the more valuable products would generally consist of medium-sized gravel. He made no effort to show that medium-sized gravel was prevalent on the ASG or the EAG parcel.

- Mr. Laporte assumed that a hypothetical contractor would assume full financial responsibility for the mining operations,

**[*46]** including the initial costs of purchasing more than $7.50 million of equipment, handling the day-to-day management of the mines for 30+ years, and defraying the inevitable costs of repairing and replacing the mining equipment. According to Mr. Laporte, a contractor would agree to assume all of these responsibilities in exchange for a mere 15% markup on the costs it incurred. Mr. Laporte supplied no credible market data to support that assumption, and we found it implausible. It is hard to believe that a profit-seeking contractor would assume all of these costs and risks, for a 30-year period, without being entitled to any share of the profits.

- Mr. Laporte assumed that the local market for the hypothetical S&G mines would lie within a 60-mile radius of the properties. However, given the extremely high costs of trucking S&G, we credited the testimony of other mining experts that the radius would be closer to 30 miles. Mr. Laporte himself acknowledged that "[m]ost construction aggregate is consumed within 40–50 miles from a mining location," noting that the general cutoff is "50 miles or less." By his own admission, therefore, Mr. Laporte exaggerated the market for the hypothetical mining businesses.

While adopting most of his assumptions from Mr. Laporte's "feasibility study," Mr. Hazel added to the mix a 13.5% "pass-through entity premium." In other words, he increased his valuation of the ASG and the EAG parcels because they were owned by investor partnerships that were passthrough entities rather than corporations. Mr. Hazel's "pass-through entity premium" was unsupported by any market analysis specific to southern Alabama. The S&G miners who testified at trial had never encountered such a premium when purchasing S&G properties, and they failed to see an economic benefit from purchasing land through a partnership as opposed to purchasing it outright. We see no reason a buyer who desired only land would pay a premium to acquire an LLC holding that same land.

Making the DCF approach even more tenuous here is the nature of the entities that would conduct the putative S&G businesses. For all intents and purposes, ASG and EAG were shell companies—passthrough LLCs owned by investors seeking tax deductions. The LLCs had no employees, management, or mining experience, and they had no meaningful capital apart from the land. Mr. Laporte's assumption that these investors would pony up $6.4 million to defray the initial capital costs of the mining businesses seemed far-fetched. Mr.

[*47] Hazel's discount rates did not account for any of this. Instead, he derived his discount rates from major producers of S&G—not shell companies with no management, equipment, or mining permits.

As the courts have often noted, income-based methods generally are "not favored if comparable-sales data are available." *Whitehouse Hotel*, 139 T.C. at 324. When the courts have used an income approach to value land with an HBU of mineral extraction, it was because extenuating circumstances made the comparable sales method inappropriate. For example, in *United States v. 179.26 Acres of Land*, 644 F.2d 367, 368 (10th Cir. 1981), on which petitioner heavily relies, the parties had stipulated that no comparable land sales existed. Because "[n]o such evidence was available," the income approach was the only method that could be used to value the property. *See id.* at 371.

Petitioner likewise errs in relying on *69.1 Acres of Land*, 942 F.2d 290. The court there accepted the taxpayer's submission that the HBU of raw land was S&G mining, *see id.* at 293–94, but the comparable sales method, not the income method, was used to determine the property's value, *see id.* at 294. The U.S. Court of Appeals for the Fourth Circuit noted its skepticism about using an income-based method to value raw land, stating: "[Income-based] valuations almost always achieve chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong. There is always demand; prices always go up; no competing material displaces the market." *Id.* at 293 (footnote omitted).

Michael Campbell, Cleveland Campbell, and Brooks Delaney all purchased S&G property in Escambia County relatively near the Big Escambia Tract. They testified that it was not uncommon to see land with S&G potential on the market. But Mr. Hazel failed to research (or at least failed to cite) any of this market evidence, asserting that he "could not find any . . . comparable properties to use as a proxy." We find the conclusion inescapable that Mr. Hazel dismissed the comparable sales method, not because no comparable sales data existed, but because the data were irreconcilable with the values he determined for the EAG parcel ($36,189 per acre) and the ASG parcel ($24,426 per acre).

Although the HBU concept "is an element in the determination of fair market value, . . . it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value." *Boltar*, 136 T.C. at 336. The record shows that S&G properties relatively close to the Subject Properties were bought and

[*48] sold over a ten-year period at prices that generally ranged between $1,000 and $2,200 per acre. Greencone itself purchased the entire Big Escambia Tract for $2,148 per acre. As far as the record of these cases reveals, the highest price ever paid for S&G property in Escambia County was the $4,301 per-acre price paid by Mr. Delaney in 2008, and it was an outlier. Given this evidence, it is wholly implausible that a hypothetical willing buyer with knowledge of the relevant facts would purchase the EAG and the ASG parcels for $36,189 and $24,426 per acre, the prices determined by Mr. Hazel.

### B.    *Value of the BEP Parcel*

Both parties' experts used the comparable sales method to determine the FMV of the BEP property, which consisted of ten largely noncontiguous sub-parcels. In the FPAA the IRS determined a value of $1,060,000 for this acreage. Respondent's expert, Mr. Rogers, determined a value of $1.6 million. Petitioner's expert, Mr. Wombwell, determined a value of $1,975,000.

All of Mr. Wombwell's comparable sales were from Alabama. Respondent did not cross-examine him regarding these transactions and does not dispute their comparability. Only one of Mr. Rogers's comparable sales was in Alabama, and it involved a 555-acre parcel with acreage that was 100% contiguous.

The experts' value conclusions are not far apart, and the difference results principally from how they defined the BEP property. Mr. Rogers prepared one appraisal and valued the property as one parcel for purposes of finding sales of comparable land, assuming a single HBU for all 710 acres. In contrast, Mr. Wombwell prepared a separate appraisal for each sub-parcel, each with its own HBU and comparable sales.

We find Mr. Wombwell's valuation method to be the more reasonable approach. The BEP property consisted of ten sub-parcels, ranging considerably in size (from 10.5 to 161.61 acres). The sub-parcels were scattered over a fairly large area, were mostly noncontiguous, and had different physical attributes. Several sub-parcels had access to major roadways, creek frontage, or both; others were completely landlocked or consisted mostly of wetlands. One sub-parcel, identified by Mr. Rogers as #1, included almost 3 acres of significant improvements, including an 8,000-square-foot combined warehouse and residence.

In short, the BEP property did not present a classic "assemblage" situation, which might dictate treating all components as a single

[*49] property for valuation purposes. *See, e.g., Am. Title Ins. Co. v. E. W. Fin.*, 16 F.3d 449, 461 (1st Cir. 1994); *Estate of Elkins v. Commissioner*, 140 T.C. 86, 132 (2013) (noting recognition in the caselaw that "certain properties possess an enhanced 'assemblage' value"), *aff'd in part, rev'd in part*, 767 F.3d 443 (5th Cir. 2014). In circumstances resembling those here, we have held that noncontiguous acreage is more appropriately valued as separate lots rather than as one parcel. *See Cave Buttes, L.L.C. v. Commissioner*, 147 T.C. 338, 368–69 (2016); *see also Hughes*, 97 T.C.M. (CCH) at 1495 & n.26 (holding that noncontiguous parcels, separated by a quarter of a mile, should be valued separately); *Carver v. Commissioner*, T.C. Memo. 1992-94, 63 T.C.M. (CCH) 2092, 2095 (noting that, although "the theory of assemblage is often an important factor in determining value," it did not apply in a situation where the parcels had differing development potential).[20]

Mr. Wombwell's analysis also seems reasonable in positing HBUs of "light industrial" or "commercial/warehouse" for several sub-parcels, including the two derived from his division of #1. These HBUs naturally led him to select comparable properties of higher value. This accounts for most of the difference between his value conclusions and those of Mr. Rogers, whose comparable properties typically had HBUs of silviculture and recreation.

In sum, we find that Mr. Wombwell conducted his comparable sales analysis in a manner appropriately tailored to the noncontiguous nature of the BEP parcel. His separate appraisals allowed him to select transactions involving properties whose location, size, topography, usage, and physical characteristics more precisely resembled those of the ten constituent sub-parcels. We accordingly find that the FMV of the fee simple interest in the BEP property was $1,975,000, as determined by Mr. Wombwell.

We have considered all of the parties' contentions that address the valuation questions decided in this Opinion. To the extent those

---

[20] Respondent urges that Mr. Wombwell's approach was improper under Uniform Standards of Professional Appraisal Practice Rule 1.4(e), which states: "When analyzing the assemblage of various estates or component parts of a property, an appraiser must analyze the effect on value, if any, of the assemblage." As noted in the text, the ten sub-parcels were randomly located and had little in common except for the fact that they were "left over" from the 12 conservation easement transactions. Because the "assemblage" had no discernable effect on value, Mr. Wombwell was not obligated to value the parcels as a single property.

**[\*50]** arguments are not discussed herein, we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Appropriate orders and decisions will be entered upon the conclusion of further proceedings in these cases.*